Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/03/2019 09:09 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
DAVID J. HIBLER, JR., APPELLANT.

___ N.W.2d ___

Filed March 1, 2019.    No. S-18-005.

1. **Constitutional Law: Statutes: Appeal and Error.** The constitutionality of a statute presents a question of law, which an appellate court independently reviews.

2. **Rules of Evidence: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence.

3. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

5. **Constitutional Law: Statutes: Presumptions.** A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality.

6. **Constitutional Law: Statutes: Waiver.** The proper procedure for raising a facial constitutional challenge to a criminal statute is to file a motion to quash, and all defects not raised in a motion to quash are taken as waived by a defendant pleading the general issue.

7. **Constitutional Law: Statutes: Standing: Proof.** Standing to challenge the constitutionality of a statute under the federal or state Constitution depends upon whether one is, or is about to be, adversely affected by the language in question; to establish standing, the contestant must show that as a consequence of the alleged unconstitutionality, the contestant is, or is about to be, deprived of a protected right.

8. **Constitutional Law: Equal Protection.** The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges. The Equal Protection Clause requires the government to treat similarly situated people alike.

9. **Equal Protection.** The Equal Protection Clause does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.

10. **Legislature: Equal Protection.** If a legislative classification involves either a suspect class or a fundamental right, courts will analyze the classification with strict scrutiny.

11. **Equal Protection: Words and Phrases.** A suspect class is one that has been saddled with such disabilities or subjected to such a history of purposeful unequal treatment as to command extraordinary protection from the majoritarian political process.

12. **Equal Protection.** Age itself is not a suspect classification for equal protection purposes.

13. ____. When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize because of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

14. **Equal Protection: Proof.** Under the rational basis test, whether an equal protection claim challenges a statute or some other government act or decision, the burden is upon the challenging party to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.

15. **Equal Protection.** Under the rational basis test, the Equal Protection Clause is satisfied as long as (1) there is a plausible policy reason for the classification, (2) the legislative facts on which the classification is based may rationally have been considered to be true by the governmental decisionmaker, and (3) the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

16. **Constitutional Law: Criminal Law: Sentences: Legislature: Courts.** The Legislature is clothed with the power of defining crimes and

misdemeanors and fixing their punishment; and its discretion in this respect, exercised within constitutional limits, is not subject to review by the courts.

17. **Constitutional Law: Criminal Law: Sentences.** With regard to the mandatory minimum sentence, the guarantees of due process and equal protection, as well as the prohibition against cruel and unusual punishment, do not require individual sentencing in noncapital cases.

18. **Witnesses: Impeachment.** As a general rule, a witness makes an inconsistent or contradictory statement if the witness refuses to either deny or affirm that he or she made the prior statement, or if the witness answers that he or she does not remember whether he or she made the prior statement.

19. **Evidence: Hearsay.** Prior extrajudicial statements of a witness may be received into evidence for the limited purpose of assisting the jury in ascertaining the credibility of the witness, but unless they are otherwise admissible, they may not be considered as substantive evidence of the facts declared in the statements.

20. **Trial: Witnesses: Impeachment.** It is sometimes difficult to determine whether a question attempts impeachment or rises to the level of a charge of recent fabrication, and it is not an abuse of discretion to allow the question where the impeachment is susceptible to either interpretation.

21. **Hearsay: Time.** A declarant's consistent out-of-court statements are permitted to rebut a charge of recent fabrication, improper influence, or improper motive when those statements were made before the charge of recent fabrication, improper influence, or improper motive.

22. **Sexual Assault: Proof: Words and Phrases.** The slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence.

23. **Effectiveness of Counsel: Postconviction: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

24. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court.

25. **Effectiveness of Counsel: Records: Appeal and Error.** On direct appeal, allegations of how the defendant was prejudiced by trial counsel's allegedly deficient conduct are unnecessary in an appellate court determination of whether the trial record supports the assigned error.

26. ____: ____: ____. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## I. NATURE OF CASE

David J. Hibler, Jr., appeals his convictions and sentences in the district court for Lancaster County, following a jury trial, for first degree sexual assault of a child, incest with a person under 18 years of age, and third degree sexual assault of a child. On appeal, Hibler argues that first degree sexual assault of a child under Neb. Rev. Stat. § 28-319.01(1)(a) and (2) (Reissue 2016) is unconstitutional, because the statute subjects the defendant to a mandatory minimum sentence based solely on the ages of the victim and perpetrator. We conclude that the age classifications defining sexual assault of a child in § 28-319.01(1)(a) and associated mandatory sentence in § 28-319.01(2) are not unconstitutional. We also determine that the district court did not abuse its discretion when it made various evidentiary rulings and that the evidence was sufficient to support Hibler's convictions. We reject several of Hibler's claims of ineffectiveness of trial counsel but do not reach the merits of various other ineffectiveness claims. For the reasons explained below, we affirm.

## II. STATEMENT OF FACTS

The State charged Hibler by information with one count of first degree sexual assault of a child, § 28-319.01(2); one count of incest with a person under 18 years of age, Neb. Rev. Stat. § 28-703 (Reissue 2016); and one count of third degree sexual assault of a child, Neb. Rev. Stat. § 28-320.01(3) (Reissue 2016). Before trial, Hibler filed a motion to quash based on his claim that the provisions of § 28-319.01(2) "violate [Hibler's] constitutional rights under the Fifth, Fourteenth and Eighth Amendment[s] to the United States Constitution and the correlative provisions of the Nebraska Constitution." At a hearing on the motion to quash, Hibler's counsel noted the motion was being filed pursuant to *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017), which states that to preserve a constitutional challenge to the mandatory minimum sentence which could be imposed, a motion to quash must be filed. The motion was overruled.

### 1. Trial

#### (a) Testimony of J.H.

J.H., the victim, was 13 years old when she testified as the State's first witness. J.H. is the oldest of the three biological children of Hibler and his former wife, A.H. J.H. testified that she was 11 years old during the events alleged in the information. She testified that her parents were still married in 2015, but she thought they were now divorced.

J.H. testified that Hibler began giving her massages when she was 11 years old, following a Soap Box Derby win in 2015. Hibler would massage her when they would run and bike together. Initially, Hibler touched only J.H.'s back and legs when he massaged her.

J.H. stated that one night when she was 11 years old, Hibler began to massage her "butt" during a massage in A.H. and Hibler's bedroom. J.H. testified that beginning in October 2015 and continuing through January 2016, Hibler touched her inappropriately more than one time, but less than 10 times. J.H. believed the inappropriate touching occurred about four or

five times. J.H. testified specifically that one incident occurred at her grandfather's home, one incident occurred in J.H.'s bedroom, and the other incidents were in the bedroom Hibler shared with A.H., J.H.'s mother.

The evidence showed that one of J.H.'s brothers has cancer and that A.H. would take him out of state once a month for treatment. J.H. stated A.H. and her brother were out of town when Hibler massaged her backside. J.H. was lying on her stomach on Hibler's bed, and she was not wearing any clothes, but had a towel over her body.

J.H. testified that another incident occurred during the morning in J.H.'s room. J.H. had a pain in her chest and Hibler told her to let him give her a massage. He told her to remove her bra so he could massage her chest. J.H. indicated that she stated no but that Hibler stated it "would make it better," so J.H. removed her bra. Hibler then massaged her breasts for possibly 5 or 10 minutes. J.H. was sitting on her bed, and Hibler was sitting next to her.

J.H. also testified that Hibler touched her genitals multiple times. Sometime in 2015, J.H. and Hibler were spending the night at her grandfather's home in Omaha, Nebraska; J.H. believed A.H. and her brother were not at the home. J.H. stated that she was lying on her side while Hibler was massaging her from behind and that at some point, he put his hand in her underwear "and started touching [her] vagina." J.H. described that it felt like a "swiping motion" and compared it to "when a girl goes to the bathroom and she takes the toilet paper, she wipes. She doesn't like stick it up her vagina, doesn't like just . . . pat it. She swipes it and then puts it in the toilet." J.H. testified that she could feel his fingers "moving up and down [her] vagina" and that it lasted a long time. She testified that she did not tell anyone, because she was scared.

J.H. testified that Hibler also touched her genitals with the "swiping motion" at the family home in Lincoln, Nebraska. J.H. thought that it occurred about three times and that it happened when A.H. and her brothers were out of town for her brother's treatment. J.H. described the swiping episodes as

follows: she would be half asleep but still aware of her surroundings, then Hibler would put his hand under her underwear and start touching her vagina in a swiping motion.

J.H. described an incident which occurred with Hibler in his bedroom during which Hibler asked J.H. to wear a pair of A.H.'s purple underwear, which tied on the sides. According to J.H., Hibler was massaging her and then had her put on the underwear that tied and began massaging her legs. At one point, Hibler untied the sides of the underwear and massaged her legs right next to her vagina. Hibler looked at her vagina, though he did not touch her vagina at that time. J.H. testified that when Hibler told her to put the underwear on, he had stated something about them making it "easier."

J.H. also testified about another incident which occurred in Hibler's bedroom in the early morning. J.H. believed that just she and Hibler were home and that A.H. and her brothers were probably out of state. During this incident, J.H. was asleep when Hibler began to massage her. When Hibler touched her, he performed the swiping motion and also put his hand over her vagina "like as if his hand were a bowl and he were putting it over [her] vagina." J.H. testified that Hibler "touched [her] vagina" and did so "more towards the top of [her] vagina where there is this thing." J.H. stated that during the previous episodes when Hibler was swiping, he would touch the labia, but "this time it was more towards the top of that" area but that she did not know the name of the area. When it was just the swiping motion, J.H. usually could feel just Hibler's fingers, but "this time [she] felt his whole hand." He "touched the top of [her] vagina" with "maybe two or three fingers," and "[h]is fingers were moving." This continued for between 15 to 30 minutes. J.H. stated that her eyes were closed but that she was not asleep. J.H. stated that this was the last incident and that it occurred around December or January. She knew that the incident did not happen in February.

J.H. testified that, initially, she did not tell anyone about this last incident, because she was scared and did not know what would happen to her and her family. However, after

her friends realized something was wrong, she met them at the school playground and told them in February. J.H. asked her friends not to tell anybody, but the mother of one of her friends learned of the alleged assaults and called the school. The principal asked J.H. to come to the office and asked her some questions. J.H. did not tell A.H. prior to when the police became involved, because she stated, "I wasn't sure if she would believe me or - I actually wanted to wait until we got a new house, because then I thought at the time, I thought it would be easier . . . ." She stated that she "tried to tell [A.H.] There were times, you know, that I would say, let's go for a ride, and I would want to tell her. Then I would chicken out because it is not something that you can walk up to somebody and say this happened."

### (b) Testimony of A.H.

A.H. testified that Hibler was born in November 1980. A.H. married Hibler in 2002 and had three biological children with him. A.H. testified that there were times she went with her son for his treatments out of state between October 2015 and March 2016. The day visits occurred about once a month and often on Fridays. In addition, A.H. recalled that there were two or three other times when she took her son out of state for treatment and that they spent the night out of state. On those occasions, Hibler stayed home with J.H. and their other son.

A.H. testified that J.H. "loved to give pedicures" and that she liked to give massages and receive them. A.H. testified it would not have been unusual for Hibler to massage J.H. after running or stretching. A.H. stated that before the police came to her workplace on March 31, 2016, to tell her that J.H. had been interviewed, J.H. had not told her anything regarding Hibler's actions.

A.H. testified that she spoke with Hibler in person on several occasions about J.H.'s accusations. They also discussed the trouble in their marriage. According to A.H., Hibler wanted A.H. to convey to J.H. that Hibler believed J.H.'s recollection

was a misunderstanding of what had occurred. According to A.H., Hibler initially admitted touching J.H. on just one occasion. A.H. testified that Hibler stated this event occurred when he took J.H. home one night; she was asleep, and he did not want to carry J.H. up the stairs, so he took J.H. to A.H. and Hibler's bed. Hibler told A.H. that "he took some melatonin and rolled over and thought [J.H. was A.H.] and he touched her." Hibler stated that "by the time he realized what he had done, the damage was done," but that it was only one time and wondered if A.H. could forgive him and try to make their marriage work.

A.H. testified that Hibler wanted A.H. to encourage J.H. to change her story and tell the police that she took melatonin and had some "really bad dreams." If this became J.H.'s story, people would believe her, they could still buy the house they wanted, they could have more children, and they could try to start over. He urged A.H. to tell J.H. that "it was just a little mistake and it didn't have to ruin everything."

A.H. testified regarding another conversation she had with Hibler on April 26, 2016, when she and Hibler sat in a truck and spoke for a "[c]ouple hours maybe." Hibler initially stated that they could possibly record the conversation, but then changed his mind, so A.H. was only able to record about 7 seconds.

In this conversation, Hibler repeated to A.H. what he had said the night before to the effect that he was sorry and ashamed, that there was no good excuse for what he had done, and that there was nothing that he could say or do that would excuse what had happened. A.H. testified that at this point, Hibler indicated there had been several episodes which started around October 2014, when A.H. was at the hospital with their son. A.H. testified that Hibler told her the first episode occurred at his father's home, sometime in October 2014. Hibler indicated that when J.H. had complained of pain in her hip flexor, he had rubbed her thighs and her hip, and she then fell asleep. Hibler described that there was a "little gap" between J.H.'s underwear and skin and that he put his fingers

in the gap and felt that "she was wet" and it was "arousing for him." A.H. stated Hibler told her he then pulled his hand back, resumed massaging her thigh and hip but then repeatedly slipped his fingers under her underwear while J.H. slept. A.H. testified that Hibler told her that at one point, he gave J.H. a frontal massage, but that it was really innocent, and that J.H. was having panic attacks or shortness of breath and would get a really sharp pain on her side, in response to which Hibler offered to rub her ribs. Hibler told her that J.H. had taken off her shirt, but the pain was in the area covered by her sports bra, so Hibler told her to take the sports bra off, and he just rubbed her muscles there, but that it was not sexual.

In connection with another incident, Hibler told A.H. that he and J.H. were home and J.H. asked to sleep in Hibler and A.H.'s bed, which was not uncommon. J.H. indicated she was scared and crying, so she slept in their room. A.H. testified that Hibler stated that either he or J.H. asked for a hug, and Hibler rolled J.H. on top of him and gave her a hug. Hibler became aroused, so he put J.H. back on the bed. A.H. testified that Hibler stated, "He thought something was wrong with him and he did not know what to do about it." A.H. stated Hibler told her he tried watching pornography, including "fake daddy-daughter porn," to cure the problem, but that did not help and in fact made things worse. Hibler stated that J.H. would sometimes ask for a foot massage, Hibler would work his way up to the hip, and Hibler would become aroused; he knew it was wrong. Hibler stated that this pattern became compulsive for him.

A.H. testified that when she asked Hibler how many episodes had happened, Hibler told her "probably a handful." He said that the last time was probably in January and that it was different. Regarding this episode, Hibler told A.H. that J.H. was in A.H. and Hibler's bedroom and that when Hibler asked J.H. if she wanted a massage, she said she did. Hibler described this episode to A.H. as follows: Hibler had J.H. take her clothes off, "handed her a thong to put on," and had her lay down on the bed and put a sheet over her like at a massage parlor. At

some point after J.H. fell asleep, Hibler put his fingers under her underwear, but she "wasn't wet"; he grabbed some "lotion or goop or lube or something" and put it on her, stroked her and cupped her genital area, touched her and massaged "the hole," and then massaged her clitoris. Hibler indicated to A.H. that he knew his actions "would make [A.H.] wet, so he was wondering if that would work" for J.H. Hibler indicated that he did not know how long his actions lasted, but that ultimately he "jacked off" and then immediately vomited in a garbage can. He stated that he realized he had made a "really bad mistake." He stated that he did not know what to do, that he tried to talk to J.H. the next day but that she was not talking to him, and that he knew something was wrong but did not know how to approach the subject.

A.H. testified that Hibler asked her to explain to J.H. the consequences of telling her therapist what Hibler had done, including what could happen financially to A.H. if Hibler were to go to jail; that Hibler was not going to get any "help" in prison; and that if A.H. did go to the police, Hibler "would never admit to anything, ever." A.H. testified that she told Hibler to take a plea so that he could still retain a relationship with their sons and that Hibler told her he would never admit to the allegations involving J.H. and that he would try to prove his innocence.

A.H. stated that sometime in April 2016, she was sorting laundry with J.H. and that when J.H. saw a pair of A.H.'s underwear which tied at the sides, J.H. was upset and wanted to get rid of them.

### (c) Testimony of Other Witnesses

The State called several witnesses: police officers, investigators, a teacher, the principal from J.H.'s school, a psychologist, and a friend of J.H. The friend testified that J.H. "told us one of her family members touched her inappropriately and we asked who and she said she could not say." She also testified that J.H. later "whispered in our ears one time during class that it was her dad." Trial counsel did not object to this testimony.

Although J.H. told her friends not to tell anyone, the friend told her mother, who told the principal of their school.

### (d) Hibler's Defense

Hibler's defense at trial was generally that A.H. may have implanted memories of sexual assault in J.H. at a time when J.H. was vulnerable, because she was experiencing problems at school, bullying, mental health issues, and estrangement from A.H. In addition, her brother, who had cancer, had become the center of attention. There was evidence that A.H. and J.H. watched a movie about child sexual abuse, and Hibler claimed that A.H. used this viewing as a vehicle to plant the idea in J.H.'s mind that she, too, had been sexually assaulted.

Hibler highlighted the fact that J.H. did not initially come forward on her own about the alleged assaults and told her friends not to tell anybody. Hibler told the jury that A.H. and Hibler were having trouble in their marriage and that A.H. had filed for divorce, claiming Hibler had confessed to her. Hibler believes that this purported confession would be used by A.H. as leverage to gain custody of the children and overcome negative facts about A.H.'s life.

Hibler's father testified on Hibler's behalf. He testified that Hibler and J.H. never stayed at his home alone in the entire time he lived at the house and that "[i]t's always been the whole family."

### 2. Verdict and Sentencing

On October 27, 2017, a jury found Hibler guilty of first degree sexual assault of a child, incest with a person under 18 years of age, and third degree sexual assault of a child. The district court imposed sentences on December 20. As to the conviction of first degree sexual assault of a child, a Class IB felony, Hibler received a sentence of 20 to 25 years' imprisonment. With regard to the conviction of incest with a person under 18 years of age, a Class IIA felony, Hibler received a sentence of 18 to 20 years' imprisonment. With regard to the conviction of third degree sexual assault of a child, a

Class IIIA felony, Hibler received a sentence of 2 to 3 years' imprisonment.

The district court ordered that Hibler serve the sentences concurrently with one another, and Hibler received 53 days' credit toward his sentences.

Hibler appealed, and gave notice under Neb. Ct. R. App. P. § 2-109(E) (rev. 2014) that his appeal includes a challenge to the constitutionality of § 28-319.01.

## III. ASSIGNMENTS OF ERROR

Hibler claims, summarized and restated, that the district court erred when it rejected his constitutional challenge to § 28-319.01. He also claims that the district court made several erroneous evidentiary rulings, including admitting diary entries of J.H.; excluding certain text messages; and preventing Hibler from examining A.H. concerning her military discharge, employment, and mental health history. Hibler claims that the State did not present sufficient evidence to support the convictions of first degree sexual assault of a child and incest, because evidence of the element of penetration was lacking. Hibler claims his trial counsel was ineffective. With regard to sentencing, as noted, Hibler claims that the mandatory minimum sentence regarding first degree sexual assault of a child where the victim is under 12 years old pursuant to § 28-319.01(2) is unconstitutional.

## IV. STANDARDS OF REVIEW

[1] The constitutionality of a statute presents a question of law, which we independently review. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017).

[2] An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on relevance, whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, and the sufficiency of a party's foundation for admitting evidence. *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018).

[3] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial,

or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

[4] Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

[5] We must first consider Hibler's facial constitutional challenge focused on the statutory elements of first degree sexual assault of a child under which he was convicted, § 28-319.01(1)(a), and, in particular, the associated mandatory minimum sentence, § 28-319.01(2). A statute is presumed to be constitutional, and all reasonable doubts are resolved in favor of its constitutionality. *State v. Harris*, 284 Neb. 214, 817 N.W.2d 258 (2012).

### 1. CONSTITUTIONAL FRAMEWORK

[6] We have held that the proper procedure for raising a facial constitutional challenge to a criminal statute is to file a motion to quash, and all defects not raised in a motion to quash are taken as waived by a defendant pleading the general issue. *Stone, supra*. Hibler filed a motion to quash that alleged that § 28-319.01(2) violates his "constitutional rights under the Fifth, Fourteenth and Eighth Amendment[s] to the United States Constitution and the correlative provisions of the Nebraska Constitution." His motion was overruled.

## 2. Constitutional Challenge:
### Equal Protection

Hibler argues that § 28-319.01 is unconstitutional on its face because its violation imposes a substantially harsher sentence than a violation of other first degree sexual assault statutes solely based on the ages of the victim and the offender. Our analysis of this age classification focuses on the propriety of the age of the victim because that analysis is dispositive of Hibler's claim.

Section 28-319.01 provides:

> (1) A person commits sexual assault of a child in the first degree:
>
> (a) When he or she subjects another person under twelve years of age to sexual penetration and the actor is at least nineteen years of age or older; or
>
> (b) When he or she subjects another person who is at least twelve years of age but less than sixteen years of age to sexual penetration and the actor is twenty-five years of age or older.
>
> (2) Sexual assault of a child in the first degree is a Class IB felony with a mandatory minimum sentence of fifteen years in prison for the first offense.

Hibler's primary constitutional challenge to § 28-319.01 is that its age classifications violate the Equal Protection Clause of the 14th Amendment and article I, § 3, of the Nebraska Constitution. Hibler maintains that the ages provided in § 28-319.01(1)(a) are arbitrary and not supported by a plausible policy reason or rational basis.

[7] Although Hibler addresses other provisions of § 28-319.01 containing age classifications, we consider only his challenge to § 28-319.01(1)(a), and in particular, the age of the victim, because he has standing to challenge only the statute that was relevant to the prosecution of his case. Standing to challenge the constitutionality of a statute under the federal or state Constitution depends upon whether one is, or is about to be, adversely affected by the language in question; to establish standing, the contestant must show that as a consequence

of the alleged unconstitutionality, the contestant is, or is about to be, deprived of a protected right. *State v. Harris*, 284 Neb. 214, 817 N.W.2d 258 (2012).

[8,9] The Nebraska Constitution and the U.S. Constitution have identical requirements for equal protection challenges. *Lingenfelter v. Lower Elkhorn NRD*, 294 Neb. 46, 881 N.W.2d 892 (2016). The Equal Protection Clause requires the government to treat similarly situated people alike. *Lingenfelter, supra.* It does not forbid classifications; it simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *Id*.

In support of his equal protection challenge, Hibler refers us to other sexual assault statutes. However, he identifies no other sexual assault statute where the victim is under 12 years of age. Thus, for example, Hibler compares first degree sexual assault of a child under § 28-319.01 to first degree sexual assault under § 28-319(1)(c), the latter of which does not carry a mandatory minimum sentence. But because first degree sexual assault under § 28-319(1)(c) is defined in part as subjecting a victim to sexual penetration when the victim is at least 12 years of age but less than 16 years of age, a violation of § 28-319(1)(c) is simply a different crime from the one of which Hibler stands convicted. Hibler's reference to other statutes does not inform our analysis.

[10-12] If a legislative classification involves either a suspect class or a fundamental right, courts will analyze the classification with strict scrutiny. *Lingenfelter, supra*. A suspect class is one that has been saddled with such disabilities or subjected to such a history of purposeful unequal treatment as to command extraordinary protection from the majoritarian political process. *Id*. Hibler does not contend he is a member of a suspect class. The classifications Hibler challenges are based on age, and age itself is not a suspect classification for equal protection purposes. See *State v. Senters*, 270 Neb. 19, 699 N.W.2d 810 (2005).

[13] When a classification created by state action does not jeopardize the exercise of a fundamental right or categorize

because of an inherently suspect characteristic, the Equal
Protection Clause requires only that the classification rationally
further a legitimate state interest. *Lingenfelter, supra*.

[14,15] Under the rational basis test, whether an equal pro-
tection claim challenges a statute or some other government act
or decision, the burden is upon the challenging party to elimi-
nate any reasonably conceivable state of facts that could pro-
vide a rational basis for the classification. *Id*. Under this most
relaxed and tolerant form of judicial scrutiny of equal protec-
tion claims, the Equal Protection Clause is satisfied as long as
(1) there is a plausible policy reason for the classification, (2)
the legislative facts on which the classification is based may
rationally have been considered to be true by the governmental
decisionmaker, and (3) the relationship of the classification to
its goal is not so attenuated as to render the distinction arbi-
trary or irrational. *Lingenfelter, supra.*

With these three considerations in mind, we review the leg-
islative history of § 28-319.01. The legislative history shows
that the bill's sponsor was concerned about the lasting harm to
victims of sexual assault in situations where the victim is very
young. The introducing senator testified before the Committee
on Judiciary that

> [i]n 2005, of the 97 people in prison for first-degree sex-
> ual assault, 23 of them had assaulted a child under the age
> of 12. Nine years is the average length of their incarcera-
> tion. By creating the new offenses, we are able to enhance
> the penalties for the most heinous crimes.

Judiciary Committee Hearing, L.B. 1199, 99th Leg., 2d Sess.
2-3 (Feb. 16, 2006). Another senator speaking during the floor
debate stated that "[i]f you offend against a child, it should
put you in a secure environment, away from the rest of your
community, for a very long time, and that is the part of the
reform that makes sense." Floor Debate, L.B. 1199, Judiciary
Committee, 99th Leg., 2d Sess. 11590 (Mar. 27, 2006).
It is reasonable to conclude that harsher punishments for
those who commit first degree sexual assault against young
children would further the policy and goal of protecting a

vulnerable group by preventing convicted perpetrators from reoffending.

In 2009, the Legislature amended § 28-319.01 to add a provision that an individual over the age of 25 who subjected a person at least 12 years of age but less than 16 years of age to sexual penetration was guilty of first degree sexual assault of a child and subject to a mandatory minimum sentence. See § 28-319.01(1)(b). Although this amendment did not affect Hibler, whose victim was under age 12, we note that statements by legislators again demonstrated, inter alia, a concern to protect young people under age 16. See Judiciary Committee Hearing, L.B. 15, 101st Leg., 1st Sess. 3 (Mar. 11, 2009).

[16] Although the age-based classifications defining first degree sexual assault of a child could have been drawn differently, the Legislature is clothed with the power of defining crimes and misdemeanors and fixing their punishment; and its discretion in this respect, exercised within constitutional limits, is not subject to review by the courts. *State v. Stratton*, 220 Neb. 854, 374 N.W.2d 31 (1985). Our review of the legislative history shows that the age classifications to which Hibler is subject in § 28-319.01(1)(a) are rationally related to plausible policy reasons considered by lawmakers and that the relationship of the classifications to their goals are not so attenuated as to render the distinction arbitrary or irrational. Hibler has not carried his burden to eliminate any reasonably conceivable state of facts that could provide a rational basis for the age classification in § 28-319.01(1)(a) and its logically associated mandatory minimum sentence in § 28-319.01(2). See *Lingenfelter v. Lower Elkhorn NRD*, 294 Neb. 46, 881 N.W.2d 892 (2016).

### 3. CONSTITUTIONAL CHALLENGES: DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT

Although Hibler frames his constitutional challenge as a violation of equal protection, his motion to quash cites other constitutional provisions, and for completeness, we briefly

comment on them. Hibler's motion to quash asserted that § 28-319.01 violates the Due Process Clause of the 5th and 14th Amendments to the U.S. Constitution and article I, § 3, of the Nebraska Constitution, as well as the Cruel and Unusual Punishment Clause of the 8th Amendment to the U.S. Constitution, as incorporated and applied to the states through the 14th Amendment. See *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). We find these challenges to be without merit.

[17] As the legislative history showed, based on the policy, goals, and facts evinced therein, the Legislature required more severe punishments for first degree sexual assault of a young child, because it concluded it was a more serious crime. As noted above, the Legislature is empowered to define crimes, and in fixing their punishments, it need not select the least severe penalties. *Stratton, supra*. With regard to the mandatory minimum sentence, it is well settled that the guarantees of due process and equal protection, as well as the prohibition against cruel and unusual punishment, do not require individual sentencing in noncapital cases. See, e.g., *State v. Ferman-Velasco*, 333 Or. 422, 41 P.3d 404 (2002); *Campbell v. State*, 268 Ga. 44, 485 S.E.2d 185 (1997); *People v Hall*, 396 Mich. 650, 242 N.W.2d 377 (1976).

It is not unconstitutional to prescribe a more severe punishment for a defendant who perpetrates sexual assault against a child under the age of 12. The age classifications in § 28-319.01(1)(a) and the associated mandatory minimum sentence in § 28-319.01(2) are not unconstitutional.

### 4. EVIDENTIARY RULINGS

We next consider Hibler's assignments of error regarding evidentiary rulings made by the district court.

### (a) A.H.'s Military Discharge, Previous Employment as an Exotic Dancer, and Mental Health History

Hibler claims that the district court abused its discretion when it sustained the State's motion in limine which prevented

Hibler from questioning A.H. about the facts of her life, including her other than honorable discharge from the military, mental health history, substance abuse, and previous employment as an exotic dancer. The district court found this line of questioning was not relevant and lacked any probative value. Hibler argues that cross-examination of A.H. on these matters was relevant, because it would have revealed that she was an unfit parent. He contends that her testimony would have strengthened his defense theory that she desired to win sole custody of their children in a future divorce proceeding by planting the sexual assault story in J.H.'s mind.

The personal issues excluded by the district court were not relevant to A.H.'s testimony about Hibler's confession, nor did the ruling hinder Hibler's defense. Hibler called A.H.'s credibility into question at trial and was able to pursue his defense by questioning her about the movie she watched with J.H., featuring a child struggling to report a sexual assault; about the "curious tim[ing]" of her filing for divorce just before she alleged Hibler confessed the sexual assaults; and about other parts of her life that he felt made him a stronger candidate for sole custody of their children. Hibler has not shown that the district court abused its discretion when it sustained the State's motion in limine regarding cross-examination of A.H.

(b) Text Messages From A.H.

Hibler claims the district court erred when it sustained the State's objection to exhibit 29 on the basis of hearsay and unfair prejudice. Exhibit 29 contained copies of text messages between A.H. and Hibler dated May 8, 2016. The data included a string of messages between A.H. and Hibler which were exchanged approximately 10 days after Hibler had allegedly admitted his conduct with J.H. Hibler contends that because the messages failed to refer to a confession, the messages are inconsistent with A.H.'s testimony that Hibler had previously confessed. Hibler asserts that the messages or portions thereof should have been admissible as impeachment of A.H. We reject Hibler's argument.

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Reissue 2016). Hearsay is not admissible unless a specific exception to the hearsay rule applies. Neb. Rev. Stat. § 27-802 (Reissue 2016).

[18,19] Hibler argues that the statements were not offered for the truth of the matters asserted but instead were properly proffered to attack the credibility of A.H. by showing an inconsistency between her testimony at trial and her text messages. As a general rule, a witness makes an inconsistent or contradictory statement if the witness refuses to either deny or affirm that he or she made the prior statement, or if the witness answers that he or she does not remember whether he or she made the prior statement. *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015). We have indicated that prior extrajudicial statements of a witness may be received into evidence for the limited purpose of assisting the jury in ascertaining the credibility of the witness, but unless they are otherwise admissible, they may not be considered as substantive evidence of the facts declared in the statements. See *id*.

In sustaining the State's objection based on hearsay, the district court stated it did not see anything in A.H.'s responses that would be appropriate for impeachment purposes and, in addition, found them to be more prejudicial than probative. We have reviewed the record, and it shows that the messages were not inconsistent with A.H.'s trial testimony. Some of the messages in question from A.H. to Hibler include: "Just [t]ell the truth"; "Stop trying to save your own skin"; "Trust is earned but not by lies and secrets"; "You did this, you made the choices"; and "Stop playing the victim and tell the truth." Contrary to Hibler's characterization, the messages did not serve to impeach or rebut A.H.'s testimony regarding Hibler's purported admission. The messages are hearsay, and the trial court did not err when it sustained the State's hearsay exception to exhibit 29 and excluded the text messages in their entirety.

### (c) Diary of J.H.

Hibler claims that the district court erred when, following cross-examination of J.H., it admitted certain of J.H.'s diary entries written before she disclosed the alleged abuse at a child advocacy center interview. The district court reasoned that the diary entries were admissible to rebut a charge of recent fabrication. Hibler contends that because he did not charge J.H. with recent fabrication or improper influence or motive, the diary entries were hearsay and not within an exception to the hearsay rule. We reject this assignment of error.

As discussed above, hearsay is not admissible unless a specific exception to the hearsay rule applies. See § 27-802. However, statements are not hearsay if they are consistent with the declarant's testimony and are offered to rebut an express or implied charge against the declarant of recent fabrication, improper influence, or improper motive under § 27-801(4)(a)(ii).

[20] Here, Hibler contends that although he sought to impeach J.H.'s testimony by attacking her credibility, such approach did not rise to an implied or express charge of recent fabrication. We have recognized that it is sometimes difficult to determine whether a question attempts impeachment or rises to the level of a charge of recent fabrication and that it is not an abuse of discretion to allow the question where the impeachment is susceptible to either interpretation. See *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). Here, the district court believed there had been an express or implied charge of recent fabrication, improper influence or motive, such that some of the statements as redacted were admissible hearsay. We do not find this determination to be an abuse of discretion.

[21] We have reviewed the record and are mindful of the dates attributed to the diary entries vis-a-vis Hibler's theory of events. We permit a declarant's consistent out-of-court statements to rebut a charge of recent fabrication, improper influence, or improper motive when those statements were made before the charge of recent fabrication, improper influence,

or improper motive. See *State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996). Hibler's defense at trial was generally that A.H. had suggested the sexual abuse claim to J.H. as a story J.H. would tell to her friends to gain attention. The entries from J.H.'s diary located on her tablet computer pertained to her state of mind regarding her approach to disclosing the alleged abuse to people around her. They were made before A.H.'s alleged suggestions. The diary rebutted Hibler's argument that J.H.'s report of sexual assault was recently fabricated.

The trial court did not abuse its discretion when it admitted portions of J.H.'s diary to rebut an express or implied charge of recent fabrication. See § 27-801(4)(a)(ii).

### 5. SUFFICIENCY OF THE EVIDENCE

Hibler claims the evidence was not sufficient at trial to prove that he committed sexual assault of a child in the first degree or incest with a person under 18 years of age. Penetration is an element of the offense of sexual assault of a child in the first degree and incest. §§ 28-319.01 and 28-703. Hibler notes that J.H. did not explicitly state that Hibler's fingers or hand "penetrated" her labia or vagina. However, taken in the light most favorable to the State, the evidence is sufficient to establish that penetration, as understood in the law, occurred.

[22] We have stated that the slightest intrusion into the genital opening is sufficient to constitute penetration, and such element may be proved by either direct or circumstantial evidence. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007). It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient. *Id*.

J.H. did not use the word "penetration" when she testified at trial, but described acts by Hibler in detail sufficient to show penetration had occurred. J.H.'s testimony was consistent with the more anatomically informed testimony of A.H. summarizing J.H.'s reports of the sexual assaults. We have refused to require that a youthful victim testify about sexual acts "in vocabulary used by a gynecologist." *State v. Hirsch*,

245 Neb. 31, 47, 511 N.W.2d 69, 80 (1994). A rational jury could conclude that Hibler's actions described above in our statement of facts section were sufficient to prove penetration. The evidence was sufficient to support the conviction for first degree sexual assault of a child and incest with a person under 18 years of age.

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

[23,24] Hibler claims that his trial counsel provided ineffective assistance in several respects. He is represented on direct appeal by different counsel from the counsel who represented him during trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id*.

[25,26] On direct appeal, allegations of how the defendant was prejudiced by trial counsel's allegedly deficient conduct are unnecessary in our determination of whether the trial record supports the assigned error. *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014), citing *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Golyar, supra*. The determining factor is whether the record is sufficient to adequately review the question. *Id*.

Hibler alleges, restated and consolidated, that his trial counsel was ineffective in the following ways:

(1) failing to object to the testimony of J.H.'s friend regarding what J.H. told her when they met at the school playground;

(2) failing to impeach and cross-examine three members of law enforcement, A.H., and J.H. regarding differences in trial testimony concerning the processing of J.H.'s tablet computer and the testimony of some of the law enforcement officers in their depositions and a police report;

(3) failing to subpoena or move to compel the State to turn over a Cellebrite report generated during data extraction of the tablet computer;

(4) failing to engage an independent forensic computer examiner to review the reports and data extractions performed on the tablet computer;

(5) failing to mount a foundational challenge to the diary entries based on a broken chain of custody of the tablet computer, because officers gave conflicting deposition testimony concerning the tablet;

(6) failing to move for a continuance when the State produced an approximately 18,000-page Cellebrite report containing the contents of A.H.'s cell phone on the first day of trial;

(7) failing to investigate or obtain bank records or cross-examine A.H. on her removal of $2,300 from a joint account with Hibler just prior to the time A.H. testified that Hibler made confessions to her;

(8) failing to cross-examine A.H. and J.H. and present evidence of the family's account with a media service provider concerning the movie they testified to watching in March 2016 that would show they watched a movie about child sexual assault prior to J.H.'s disclosure to her friends;

(9) failing to introduce evidence of an episode of a television show concerning victims of crimes which the family had watched and, instead of introducing this evidence or cross-examining J.H., only asking J.H. if it was one of her favorite shows, to which she responded, "No";

(10) failing to cross-examine A.H. or investigate the facts that the purple underwear which tied on the sides and was

entered as an exhibit was clothing A.H. wore as an exotic dancer, that it was stored in a suitcase in a storage room, and that A.H. would have noticed if Hibler had searched through the suitcase and brought out the underwear;

(11) failing to cross-examine A.H. and present evidence that A.H. was discharged from military service because she lied about her mental health diagnosis on her enlistment forms;

(12) failing to investigate the online relationship A.H. had with a man she described as living in Hawaii, where such investigation would have revealed the relationship was significant and ongoing;

(13) failing to investigate or adequately cross-examine A.H. concerning previous efforts to take custody of their children from Hibler;

(14) failing to investigate and present evidence that J.H. made a false allegation against A.H.'s uncle in Arizona;

(15) failing to thoroughly investigate or cross-examine witnesses concerning the fact that the father of one of J.H.'s friends to whom she disclosed the abuse at the playground said the disclosure happened in March, not February, which information was revealed in the Cellebrite report provided to Hibler on the first day of trial;

(16) failing to subpoena or otherwise obtain records from the Ronald McDonald House in Kansas City, Missouri, which would have demonstrated the sexual assaults could not have occurred as J.H. testified, because A.H. was not in Kansas City at the times asserted by A.H. and J.H. at trial;

(17) failing to subpoena or investigate witnesses and failing to cross-examine Hibler's father when he testified at trial concerning the fact that Hibler almost never drank alcohol;

(18) failing to examine two law enforcement officers regarding the police report that was generated after J.H.'s deposition in which she testified that the tablet computer had been returned to her possession and that she agreed not to do anything with it until the completion of the trial;

(19) failing to recall A.H. and J.H. during trial to rebut the State's case on matters discussed above;

(20) representing to the jury during closing arguments that Hibler might have committed some of the alleged acts even though Hibler specifically told trial counsel he did not engage in any sexual touching of J.H.;

(21) advising Hibler not to testify when Hibler informed trial counsel he did not engage in any sexual touching of J.H.;

(22) failing to cross-examine any of the police officers who testified as to the reasons for the delay of at least 1 year of the interviews of the children who were present at the playground where J.H. initially disclosed the sexual assaults;

(23) failing to cross-examine J.H.'s friend and the principal regarding who walked J.H. back to her classroom following her interview with the principal and teacher where police reports contradict the principal's testimony concerning who J.H. interacted with in the minutes following the interview; and

(24) failing to subpoena witnesses from the school who would have testified that J.H. had been caught lying to school officials about unrelated matters in the time prior to her allegations against Hibler.

We have reviewed the record and have determined that the record on appeal is sufficient to review and reject claims Nos. 1, 11, 19, and 20 on direct appeal. The remaining claims of ineffectiveness of trial counsel cannot be resolved on direct appeal because they implicate matters outside the record, such as information known or not known to trial counsel and conversations between Hibler and trial counsel.

In ineffectiveness claim No. 1, Hibler asserts that his trial counsel should have objected to testimony by one of J.H.'s friends to the effect that J.H. disclosed to her and some other friends at the school playground that someone in her family was touching her inappropriately. He contends that such objection would have been sustained and that if the testimony had been excluded, it would have resulted in a reasonable probability of a different outcome in his case. We do not agree. J.H. had already testified that she told her friends at school what was happening. Hibler was not prejudiced by any failure of his trial counsel to object to this cumulative testimony.

In ineffectiveness claim No. 11, Hibler asserts his counsel was ineffective for failing to cross-examine A.H. and present evidence that A.H. was discharged from military service because she lied about her mental health diagnosis on her enlistment forms. The record refutes this claim. During the foundational examination of A.H., the district court heard testimony from A.H. that she did not tell the military about her mental health history and that she later informed the military about it to get discharged. After hearing the testimony, the district court ruled the information was inadmissible. Hibler's trial counsel was not ineffective for refraining from examining A.H. regarding her mental health and the military where the district court had ruled such evidence was inadmissible.

In ineffectiveness claim No. 19, Hibler asserts his trial counsel was deficient for not recalling A.H. and J.H. to testify during trial to rebut the State's case. He does not offer what he believes the testimony of A.H. and J.H. would have been and why it was deficient to not recall them. This claim has not been stated with sufficient particularity.

In ineffectiveness claim No. 20, Hibler asserts that his trial counsel represented to the jury that Hibler might have committed some of the alleged acts even though Hibler had told his counsel that he did not engage in any sexual touching of J.H. Hibler does not direct us to any examples of trial counsel's purportedly making "admissions" on Hibler's behalf, and we find none. This claim is refuted by the record.

## VI. CONCLUSION

For the reasons stated above, in this direct appeal from a jury trial, we reject Hibler's facial state and federal constitutional challenges to the age classifications defining first degree sexual assault of a child and the corresponding mandatory sentence in § 28-319.01(1)(a) and (2). We conclude that the district court did not abuse its discretion with regard to the evidentiary rulings challenged by Hibler. The evidence at trial was sufficient to establish the element of sexual penetration to support Hibler's convictions for sexual assault of a child in

the first degree and incest with a person under 18 years of age. See §§ 28-319.01 and 28-703. Finally, the record is insufficient to resolve the majority of Hibler's claims of ineffectiveness of trial counsel on direct appeal. However, we review and reject certain of these claims as described above. We affirm Hibler's convictions and sentences for first degree sexual assault of a child, incest with a person under 18 years of age, and third degree sexual assault of a child.

AFFIRMED.

STACY, J., concurring.

I agree with the majority's analysis and holding, including its careful application of rational basis scrutiny to analyze the equal protection challenge presented here. I write separately to emphasize something the majority opinion does not do: apply a threshold "similarly situated" test.

That is significant, because many of our prior opinions describe a threshold showing that a litigant must satisfy before a court will engage in constitutional scrutiny of an equal protection claim.[1] As recently as 2015, we described the threshold showing this way:

> The initial inquiry in an equal protection analysis is whether the challenger is similarly situated to another group for the purpose of the challenged government action. Absent this threshold showing, there is not a

---

[1] See, *State v. Loyuk*, 289 Neb. 967, 857 N.W.2d 833 (2015); *Sherman T. v. Karyn N.*, 286 Neb. 468, 837 N.W.2d 746 (2013); *State v. Harris*, 284 Neb. 214, 817 N.W.2d 258 (2012); *State v. Rung*, 278 Neb. 855, 774 N.W.2d 621 (2009); *In re Interest of J.R.*, 277 Neb. 362, 762 N.W.2d 305 (2009); *Henly v. Neth*, 271 Neb. 402, 712 N.W.2d 251 (2006); *In re Interest of Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006), *disapproved in part on other grounds, In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007); *Hass v. Neth*, 265 Neb. 321, 657 N.W.2d 11 (2003); *Benitez v. Rasmussen*, 261 Neb. 806, 626 N.W.2d 209 (2001); *Bauers v. City of Lincoln*, 255 Neb. 572, 586 N.W.2d 452 (1998); *Gramercy Hill Enters. v. State*, 255 Neb. 717, 587 N.W.2d 378 (1998); *DeCoste v. City of Wahoo*, 255 Neb. 266, 583 N.W.2d 595 (1998); *State v. Atkins*, 250 Neb. 315, 549 N.W.2d 159 (1996).

viable equal protection claim. In other words, dissimilar treatment of dissimilarly situated persons does not violate equal protection rights.[2]

This court first applied the threshold "similarly situated" test in the 1996 case of *State v. Atkins*.[3] There, this court was considering whether the Equal Protection Clause was violated by the different statutory methods used to calculate good time for inmates housed in state prisons[4] as compared to those housed in county jails.[5] This court began its analysis by reciting a principle recognized by the U.S. Supreme Court: "As a general matter, the Equal Protection Clause requires the government to treat similarly situated people alike."[6] We then adopted a new principle articulated by the U.S. Eighth Circuit Court of Appeals in *Klinger v. Department of Corrections*[7]: "[T]he dissimilar treatment of dissimilarly situated persons does not violate equal protection rights."[8] We also adopted the threshold test applied by the majority in *Klinger* and announced:

> [T]he initial inquiry in an equal protection analysis focuses on whether one has demonstrated that one was treated differently than others similarly situated. Absent this threshold showing, one lacks a viable equal protection claim. . . .
>
> If one can make this threshold showing, the inquiry then shifts to whether the legislation at issue can survive judicial scrutiny.[9]

---

[2] *Loyuk, supra* note 1, 289 Neb. at 978, 857 N.W.2d at 844.

[3] *Atkins, supra* note 1.

[4] See Neb. Rev. Stat. § 83-1,107 (Cum. Supp. 2018).

[5] See Neb. Rev. Stat. § 47-502 (Reissue 2010).

[6] *Atkins, supra* note 1, 250 Neb. at 320, 549 N.W.2d at 163, citing *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

[7] *Klinger v. Department of Corrections*, 31 F.3d 727 (8th Cir. 1994).

[8] *Atkins, supra* note 1, 250 Neb. at 320, 549 N.W.2d at 163.

[9] *Id.* at 320-21, 549 N.W.2d at 163 (citation omitted).

In *Atkins*, we concluded it was unnecessary to reach the merits of the equal protection claim because we determined, as a threshold matter, that inmates in state prisons were not similarly situated to inmates in county jails.

Although the adoption in *Klinger* of a threshold similarly situated test has been criticized by judges[10] and commentators[11] as undercutting meaningful equal protection analysis, this court has continued to apply the test to equal protection claims in a variety of contexts.[12] In many of those cases, we found the threshold "similarly situated" showing was not met, and denied the equal protection claim without reaching the merits or engaging in constitutional analysis.[13] In doing so, our application of the threshold "similarly situated" test effectively foreclosed meaningful equal protection review altogether by relying on nothing more than factual differences between two groups. This is not to suggest that factual differences are irrelevant to the equal protection analysis, but as the U.S. Supreme Court's holding in *Cleburne v. Cleburne Living*

---

[10] See, e.g., *Women Prisoners of D.C. Correct. v. D.C.*, 93 F.3d 910 (D.C. Cir. 1996) (Rogers, Circuit Judge, concurring in part, and in part dissenting); *Klinger, supra* note 7 (McMillian, Circuit Judge, dissenting); *Varnum v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009) ("[i]n considering whether two classes are similarly situated, a court cannot simply look at the trait used by the legislature to define a classification under a statute and conclude a person without that trait is not similarly situated to persons with the trait").

[11] See, Angie Baker, Note, *Leapfrogging over Equal Protection Analysis: The Eighth Circuit Sanctions Separate and Unequal Facilities for Males and Females in* Klinger v. Department of Corrections, 31 F.3d 727 (8th Cir. 1994), 76 Neb. L. Rev. 371 (1997); Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581 (2011).

[12] See cases cited *supra* note 1.

[13] See, e.g., *In re Interest of Phoenix L., supra* note 1 (parents of Indian children not similarly situated to parents of non-Indian children); *Benitez, supra* note 1 (those with unsubstantiated reports of child abuse not similarly situated to those with court-substantiated reports of child abuse); *Gramercy Hill Enters., supra* note 1 (two nursing homes not similarly situated); *Atkins, supra* note 1 (county jail inmates and state prison inmates not similarly situated).

*Center, Inc.*[14] illustrates, the mere fact that two groups are different from one another does not mean the State can show a rational basis for treating them differently under the law.

The legal conclusion that two groups are not "similarly situated" is not one courts should be making as a threshold matter, as doing so serves only to insulate the challenged classification from any meaningful equal protection review. If two groups are not similarly situated, the proper constitutional analysis will bear that out. The majority opinion illustrates this point.

After reciting the overarching principle that "[t]he Equal Protection Clause requires the government to treat similarly situated people alike" the majority proceeds to analyze the equal protection claim by applying rational basis scrutiny to the age-based classification being challenged here. Only after completing this analysis does the majority conclude that Hibler's equal protection claim lacks merit.

A threshold "similarly situated" inquiry is a poor substitute for careful judicial scrutiny of the fit between the State's interest and the challenged classification. I would like to see this court expressly disapprove of our prior cases that have recognized a threshold "similarly situated" inquiry in equal protection cases. But I am encouraged by the fact that the majority opinion neither cites to nor endorses a threshold "similarly situated" test, and I therefore concur in all respects.

---

[14] *Cleburne, supra* note 6.