IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. STONE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

HAROLD L. STONE, APPELLANT.

Filed September 1, 2020.    No. A-19-642.

Appeal from the District Court for Thayer County: VICKY L. JOHNSON, Judge. Affirmed.

Mark E. Rappl for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, Chief Judge, and RIEDMANN and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

This is a postconviction appeal. In 2016, Harold. L. Stone was convicted by a jury of four counts of first degree sexual assault of a child, each a Class IB felony, and one count of child abuse, a Class IIIA felony. Stone was sentenced to imprisonment for a mandatory minimum term of 15 years and maximum term of 20 years on each sexual assault conviction, and to a term of 4 to 5 years' imprisonment on the child abuse conviction, with two of the sexual assault sentences to be served consecutively and the remaining sentences to be served concurrently. On direct appeal, the Nebraska Supreme Court affirmed Stone's convictions and sentences. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017).

Stone now appeals the decision of the district court for Thayer County which denied his motion for postconviction relief without an evidentiary hearing. In this appeal, Stone alleges a variety of errors concerning the court's denial of relief related to his assertions of ineffective

assistance of his trial and appellate counsel. Stone also alleges that the district court erred in finding that he was not denied due process during the original proceedings. For the reasons set forth herein, we affirm the decision of the district court to deny Stone's motion for postconviction relief without an evidentiary hearing.

## II. BACKGROUND

In June 2016, Stone was charged by information with five counts of first degree sexual assault of a child and one count of child abuse. The amended information alleged Stone sexually penetrated the victim, H.W., on five separate occasions in 2014 and 2015, at a time when H.W. was under the age of 16 and Stone was over the age of 25. Stone entered pleas of not guilty, and the matter proceeded to trial.

H.W. was adopted by her parents when she was 9 months old after suffering severe abuse and neglect for the first few months of her life. H.W. was subsequently diagnosed with fetal alcohol effects and reactive attachment disorder. H.W.'s mother, Lynne, testified that H.W. had behavioral problems as a result of her diagnoses and she required a great deal of structure, routine, and oversight. H.W.'s therapist elaborated on H.W.'s diagnosis of reactive attachment disorder when she testified that children with reactive attachment disorder can be manipulative and great "storytellers." In addition, they can be apt to form inappropriate attachments with older adults, to be hypersexual, and to fail to anticipate the consequences of their actions. Children with reactive attachment disorder can be difficult to parent and are vulnerable to abuse.

H.W. was homeschooled after her sixth grade year so that Lynne could more closely monitor H.W. At home, H.W. was not permitted to have her own cellular telephone, nor was she permitted to have any unsupervised access to a computer.

During the spring of 2014, when H.W. was 14 years old, H.W. and her family met Stone at church. Shortly thereafter, H.W. began assisting Stone in his nearby garden, greenhouse, and specialty store. Then, in August, Stone approached Lynne regarding him helping to homeschool H.W. In particular, Stone indicated that he could help H.W. with science and math as a result of his background. Lynne agreed.

At trial, H.W. testified that when Stone started homeschooling her, he began making comments of a sexual nature, including telling H.W. that she needed "sex education." In addition, despite Lynne's directives, Stone gave H.W. her own cellular telephone and access to an iPad and helped H.W. to set up her own email and social media accounts.

H.W. testified that on August 20, 2014, which was Stone's birthday, Stone kissed her on the neck. H.W. indicated that she told Stone, "No." However, during the next few weeks, Stone continued to act sexually toward H.W., including repeatedly taking her clothes off and touching her breasts and touching both outside and inside of her vagina. H.W. described how Stone would become upset with himself when he was unable to perform sexually during these instances.

On September 24, 2014, which was H.W.'s 15th birthday, she and Stone planned to spend the day together. H.W. wanted to get her hair done, get her nose pierced, and go to a restaurant to eat. Stone told H.W. that they were also going to have sexual intercourse that day. H.W. testified that she did not feel that she had a choice about having sex with Stone, especially when he showed her that he had purchased condoms. When H.W. and Stone returned to Stone's house that

afternoon, Stone gave H.W. an alcoholic beverage to drink while he took "Viagra." They both went upstairs to the guest room where they got undressed. H.W. described touching Stone's erect penis and him touching her bare chest and inside of her vagina. H.W. testified that they performed fellatio and cunnilingus on each other and then had penile-vaginal sexual intercourse. H.W. described that Stone ended up not wearing a condom, but did ejaculate.

After having sexual intercourse with Stone, H.W. went to Stone's store for a little while. When she returned to Stone's house, they had sexual intercourse again. This time, she remembered him ejaculating on her right leg. H.W. testified that her father then came to pick her up from Stone's house.

H.W. testified that her sexual relationship with Stone continued on a regular basis through December 2014. She described two specific instances which occurred during the fall and winter of 2014. During these instances, Stone would make her an alcoholic beverage to drink and they would engage in various sexual acts, including penile-vaginal sex. H.W. also described Stone taking pictures of her in his bed. H.W. explained that Stone took one of the pictures while he was straddling her in his bed.

Stone left Nebraska for much of the month of January 2015, but when he returned, H.W. testified that their sexual relationship resumed. H.W. testified that her last sexual experience with Stone occurred in February 2015, when Stone drove her and her sister to an educational conference in Omaha, Nebraska. The night before the conference, H.W. described talking with Stone over "facetime" while she was in the bathtub. Evidence at trial revealed that Stone had taken a screenshot of H.W. during this telephone call which depicted her in the bathtub. This photograph was found on his electronic devices.

On the way home from the conference, H.W. and Stone believed that H.W.'s sister was asleep in the backseat of the vehicle. Stone began touching H.W. under her shirt and bra. He then put his hand in her pants and put his fingers inside of her vagina. When he was done, H.W. and Stone held hands with their fingers interlocked.

H.W. testified that her sexual relationship with Stone ended because Lynne would no longer allow her to see Stone. H.W. indicated that at that time, she believed she loved Stone and that they were going to have a future together. A few months after their sexual relationship ended, however, H.W. disclosed that Stone had been sexually abusing her.

While H.W.'s testimony was the only direct evidence of the sexual abuse, there was other evidence presented at trial which corroborated her account of her relationship with Stone. For example, in an email sent from H.W. to Stone the night before H.W.'s birthday, H.W. wrote, "Hair[,] Piercing[,] Massage[,] Eat[,] Victoria Secret[,] Condoms[, and] YADA YADA YADA[.]" Within minutes, Stone responded, "Got it! Good night!" In December 2014, Lynne found a card written by H.W. to Stone. In the card, H.W. had written, "Can[']t wait till I[']m 18 because its Legal and etc." When Lynne confronted Stone about the card, Stone wanted to see the card and then took it from Lynne and did not return it.

Inappropriate photographs taken of H.W., some with one of Stone's electronic devices, were found saved on Stone's computer. These photographs included two images of H.W. naked in Stone's bed covered only by a sheet.

H.W.'s sister testified about her time with H.W. and Stone at the educational conference in February 2015. She testified that she observed Stone tell H.W. he loved her, hug H.W., and kiss H.W. on the top of her head. She admitted that she had fallen asleep on the ride home from the conference, but when she woke up, she observed H.W. and Stone holding hands with each other with their fingers interlocked.

Lynne testified regarding her observations of H.W. and Stone as well. She indicated that she had some concerns regarding Stone's relationship with H.W. early on. However, these concerns increased when Stone sent Lynne a text message on October 2, 2014, at 1:42 in the morning. The text message said:

> Here is when you know that it is on the edge of being obsessive. . . . You wake up in the middle of the night in a hotel and scramble to put on your clothes because you got to take [H.W.] home. . . . Until [your wife] reminds you that you are in Ogallala, and there is no way [H.W.] could be here."

Lynne testified that around the same time that she received that text message from Stone, she started going with H.W. to help in Stone's store. While at the store, Lynne observed Stone and H.W. whispering together. In addition, they would regularly find excuses to leave alone together, despite Lynne's protests. Lynne explained that on multiple occasions, Stone and H.W. indicated that they were going to take the composting to the greenhouse, but when they returned awhile later, the composting was still in the back of Stone's truck.

Lynne testified that in late January 2015, after Lynne had told Stone that he could no longer be alone with H.W., Stone "begged and pleaded" with Lynne to sign her parental rights to H.W. over to Stone. In February 2015, after Lynne had cut off all contact between H.W. and Stone, Stone continued to try and contact H.W.

Stone testified in his own defense. He denied ever having sexual intercourse with H.W. He admitted that H.W. would talk to him about her sexual relationships with other boys and that, as a result, he talked with H.W. about safe sex practices. Stone also denied taking inappropriate photographs of H.W. He indicated that he was not even home during the time one of the photographs had been taken. While he was not sure how the images got onto his computer, he did testify that he knew of the pictures' existence prior to the police investigation. Stone indicated that in January 2015, he found "a cache of very inappropriate images on [his] computer." He speculated that H.W. put them on the computer because she had access and his permission to use his electronic devices.

Ultimately, the jury convicted Stone of four counts of first degree sexual assault of a child and one count of child abuse. The jury acquitted Stone of one of the counts of first degree sexual assault of a child alleged in the information.

As we mentioned above, Stone appealed from his convictions. At the time of this appeal, Stone had the same counsel as during the trial. As such, he did not allege any claims of ineffective assistance of trial counsel in his direct appeal. Rather, he alleged a challenge to the constitutionality of the statute which imposed a mandatory minimum prison term for convictions of first degree sexual assault of a child. In addition, he argued the sentences imposed upon him by the district court were excessive. The Supreme Court affirmed Stone's convictions and sentences. See *State*

*v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017). Specifically, the court held that Stone had failed to preserve for its review his constitutional challenge and that the sentences imposed by the district court were not unreasonable or excessive. *Id*.

In October 2018, Stone filed a verified motion seeking postconviction relief. In the motion, he alleged numerous claims of ineffective assistance of trial and appellate counsel. The State filed a motion to dismiss the verified motion. Ultimately, the district court denied Stone's verified motion without an evidentiary hearing. The court found that counsel's performance was not deficient at the trial or appellate level. The court also found that given the totality of the evidence presented at trial, even if other evidence was offered or available, there was not a reasonable probability that the result of the trial would have been different.

Stone appeals from the district court's order here.

### III. ASSIGNMENT OF ERROR

Stone generally contends that the district court erred in denying him an evidentiary hearing on the issues raised in his motion for postconviction relief. We note that Stone does not assign error to the denial of every claim made in his petition. We address those claims to which error is specifically assigned and argued in his brief.

### IV. STANDARD OF REVIEW

In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Assad*, 304 Neb. 979, 938 N.W.2d 297 (2020).

### V. ANALYSIS

Stone contends that the district court erred in denying him an evidentiary hearing on the issues raised in his motion for postconviction relief. As we previously noted, in Stone's motion for postconviction relief, he raised numerous allegations of ineffective assistance of trial and appellate counsel. Before turning to Stone's specific claims on appeal, we review the general principles governing postconviction actions asserting claims of ineffective assistance of counsel.

Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018), *disapproved on other grounds, State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018). On appeal from the denial of postconviction relief without an evidentiary hearing, the question is not whether the movant was entitled to relief by having made the requisite showing. Instead, it must be determined whether the allegations were sufficient to grant an evidentiary hearing. *Id*.

The allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified. *Id*. In a proceeding under the Nebraska Postconviction Act, the application is required to allege facts which, if proved, constitute a violation or infringement of constitutional rights, and the pleading of mere conclusions of fact or of law is not sufficient to require the court to grant an evidentiary hearing. *State v. Haynes, supra*. An evidentiary hearing must be granted when the facts

alleged, if proved, would justify relief, or when a factual dispute arises as to whether a constitutional right is being denied. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018). A court may address the two prongs of this test, deficient performance and prejudice, in either order. *State v. Schwaderer*, 296 Neb. 932, 898 N.W.2d 318 (2017).

In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *State v. Haynes, supra*. In determining whether trial counsel's performance was deficient, courts give counsel's acts a strong presumption of reasonableness. *State v. Alfredson*, 287 Neb. 477, 842 N.W.2d 815 (2014). An appellate court will not judge an ineffectiveness of counsel claim in hindsight. *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011). We must assess trial counsel's performance from counsel's perspective when counsel provided the assistance. *Id*. When reviewing claims of ineffective assistance, we will not second-guess trial counsel's reasonable strategic decisions. *Id*.

Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *State v. Haynes, supra*. To establish the prejudice prong of a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Schwaderer, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *State v. Custer*, 298 Neb. 279, 903 N.W.2d 911 (2017).

We now turn to Stone's specific allegations of ineffective assistance of counsel. We divide Stone's allegations into those that occurred prior to trial, those that occurred during the trial, and those that occurred on direct appeal.

### 1. PRETRIAL INVESTIGATIONS AND TRIAL PREPARATION

#### (a) Failure to File Motion for Change in Venue

Stone alleges his trial counsel provided ineffective assistance by failing to file a motion for a change in venue. Specifically, Stone alleges that counsel should have requested a change in venue due to both the pretrial publicity generated about the case in Thayer County and the "prominence" of H.W.'s family in Thayer County. Brief for appellant at 19. Stone asserts that "it was impossible for [him] to have a fair trial" there. *Id*. at 20. Stone contends that he asked trial counsel to file a motion for a change of venue, but counsel refused to do so based upon the cost.

Juror exposure to information about a defendant's prior convictions or to news accounts of the crime with which he is charged does not alone presumptively deprive the defendant of due process. *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). A court will normally not presume unconstitutional partiality because of media coverage, unless the record shows a barrage

of inflammatory publicity immediately prior to trial amounting to a huge wave of public passion or resulting in a trial atmosphere utterly corrupted by press coverage. *Id*. The quantum of news coverage is not dispositive. *Id*. Even the community's extensive knowledge about the crime or the defendant through pretrial publicity is insufficient in itself to render a trial constitutionally unfair when the media coverage consists of merely factual accounts that do not reflect animus or hostility toward the defendant. *Id*.

Stone provided no examples of inflammatory news coverage so egregious that it corrupted the trial atmosphere. In addition, he provided no specific examples of bias outside of his own generalized assertions that H.W.'s family was well known in the area and he was not. More significantly Stone does not allege that any of the jurors who actually sat on his case were biased either against him or in favor of H.W. Essentially, Stone has failed to sufficiently demonstrate that had his trial counsel filed a motion for a change in venue, that the motion would have been successful. As a result, the district court did not err in denying Stone an evidentiary hearing on this ground.

(b) Failure to File Motion to Suppress

At trial, the State offered into evidence exhibit 99, a journal which had been authored by Stone and seized by police during a search of his home. The journal included notes about Stone's garden work, to do lists, and recipes. In addition, it included writings about H.W., particularly writings about H.W.'s personality, behaviors, and Stone's efforts to help her. At one point in the journal, Stone writes, "Is [H.W.] 'in love' with me. She is in love with someone who was willing to reach through the nastiness and see her, play with her, take her seriously." Stone indicated that H.W. spoke with him about her sexual experiences and while he listened, he would quickly change the topic to something work related. He also indicated that H.W. would initiate conversations about having a sexual relationship with Stone, but he would not engage with her.

Later in the journal, Stone wrote about his struggles after H.W.'s mother would no longer permit him to see H.W. or herself. In writing on this subject, Stone expresses a confusion about why his relationship with them had to end. He appears to deny having any sort of inappropriate relationship with H.W. The journal indicates that Stone suffered from frequent anxiety attacks.

In his motion for postconviction relief and in this appeal, Stone alleges that his trial counsel provided ineffective assistance when he failed to file a motion to suppress the journal. Stone asserts that the journal seized by law enforcement during the search of his home was outside the scope of the search warrant and that, had counsel filed a motion to suppress, the journal would not have been admitted as evidence at trial. Stone further asserts that the journal was prejudicial and denied him the right to a fair trial.

Upon our review, we conclude that Stone is not entitled to an evidentiary hearing on this ground. First, we note that Stone has failed to provide any case law or other support for his conclusory suggestion that a motion to suppress the journal would have been successful. In its order denying Stone's motion for postconviction relief without an evidentiary hearing, the district court found "that Nebraska law allows admission of evidence if the officers are acting under a warrant and rely on it in good faith." In his brief on appeal, Stone argues that "the good faith exception is inapplicable to the present case because law enforcement was not relying upon a

mistake or error made by the magistrate." Brief for appellant at 19. However, he cites to no case law to support his generalized assertion.

Even if we were to find that counsel provided deficient performance when failing to file a pretrial motion to suppress the journal, Stone has failed to demonstrate how he was prejudiced by the admission of this evidence. He merely asserts that the journal was "prejudicial" to his defense, but does not explain how. In our review of the journal, there is nothing in the journal which overtly demonstrates that Stone engaged in a sexual relationship with H.W. To the contrary, Stone denies having such a relationship multiple times in the journal. Stone's musings about H.W. relate more to his desire to help H.W. with her behavioral problems, her home life, and her education. Stone testified to all of this during the trial. Because Stone cannot demonstrate any prejudice as a result of the admission of the journal into evidence, he is not entitled to an evidentiary hearing on this ground.

(c) Failure to File *Daubert*/*Schafersman* Motion Regarding
Admissibility of Expert Testimony

At trial, the State called Dr. Barbara Sturgis to testify during its case in chief. Sturgis is a psychologist who has specialized training in dealing with victims of child sexual assault. She has previously been certified as an expert witness in the area of child sexual assault in Nebraska courts at least 17 times, including on the topics of how children respond to sexual abuse, how and when children disclose sexual abuse, and how to appropriately conduct interviews of victims of child sexual abuse. Sturgis testified that there is no "typical" reaction to sexual assault in children. She also testified that when children disclose sexual assault, they often do not provide all of the details at first.

In his motion for postconviction relief and in this appeal, Stone alleges that his trial counsel provided ineffective assistance of counsel when he failed to "file a *Daubert*/*Schafersman* motion to determine the admissibility of" Sturgis' testimony. Brief for appellant at 20. Specifically, Stone alleges that had a hearing been held on such a motion, the district court would have become aware that the research relied upon by Sturgis was "conducted six or more years prior to trial" and that during the hearing evidence could have been adduced regarding the initial or continued validity of those studies. *Id*. Stone also alleges that evidence could have been adduced regarding how H.W.'s reactive attachment disorder diagnosis may have affected Sturgis' opinions. Upon our review, we do not find that Stone is entitled to an evidentiary hearing on this ground.

Under the *Daubert*/*Schafersman* jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009). This gatekeeping function entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id*. Once the validity of the expert's reasoning or methodology has been satisfactorily established, any remaining questions regarding the manner in which that methodology was applied in a particular case will generally go to the weight of such evidence. *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

In evaluating the admissibility of expert scientific testimony, a trial judge considers a number of factors. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). These factors include

whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in a particular technique, there exists a high known or potential rate of error; whether standards exist for controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id*. These factors are not exclusive or binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id*.

In his brief on appeal, Stone has failed to affirmatively allege which of the factors delineated above would have warranted excluding the exclusion of Sturgis' testimony. Instead, Stone merely alleges that the research and studies relied upon by Sturgis are around 6 years old. He then concludes that based upon the age of the studies, there may have been more recent research which may have contained updated information. Such conclusory allegations are not sufficient to warrant an evidentiary hearing on this ground.

A *Daubert/Schafersman* motion addressing the content of Sturgis' testimony would not have resulted in exclusion. In her testimony, Sturgis stated that she has been certified as an expert witness in the area of child sexual assault in Nebraska courts at least 17 times. Expert testimony on the topic of how children react to sexual assault and when they disclose has been found to be admissible in our courts. We addressed this issue in *State v. McCurdy*, 25 Neb. App. 486, 908 N.W.2d 407 (2018). There we stated:

> The primary purpose of Sturgis' testimony, as limited after McCurdy's pretrial motion in limine, was to provide the jury with background concerning child victims and how they differ from adult victims. The Nebraska Supreme Court has previously approved of the use of the type of testimony given by Sturgis. See, e.g., *State v. Fleming*, 280 Neb. 967, 792 N.W.2d 147 (2010). The court has noted that this type of evidence is helpful because "'"[f]ew jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship," and "the behavior exhibited by sexually abused children is often contrary to what most adults would expect."'" *Id*. at 973, 792 N.W.2d at 154, quoting *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992).

*State v. McCurdy*, 25 Neb. App. at 500, 908 N.W.2d at 418.

It is clear that the subject matter of Sturgis' testimony was relevant and would not have been precluded in a *Daubert/Schafersman* hearing. The issue raised goes to the weight, not the admissibility of Sturgis' testimony. We note that Sturgis was thoroughly cross-examined by trial counsel regarding the studies and research she relied upon in formulating her opinions. We further note that both the trial and appellate courts of this state have recognized Sturgis to be qualified to give expert testimony on these issues. The Supreme Court has previously held that trial courts need not reinvent the wheel each time that specialized evidence is adduced. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010). Instead, once a Nebraska trial court has actually examined and assessed the reliability of a particular scientific wheel under *Daubert*, and its determination has been affirmed on appeal, then other courts may simply take judicial notice and ride behind. *State v. Casillas, supra*.

Finally, we note that a *Daubert/Schafersman* hearing would not have been warranted based upon Stone's assertion that Sturgis' opinion may have been affected by H.W.'s reactive attachment

disorder diagnosis. Again,the application of Sturgis' reasoning and methodology to the facts of this case go to the weight of Sturgis' testimony, not to the admissibility. Trial counsel had the opportunity and did question Sturgis regarding the effect of H.W.'s diagnosis on Sturgis' opinions.

(d) Failure to Obtain Material Evidence

*(i) Stone's Cellular Telephone Records*

In his brief on appeal, Stone alleges that his trial counsel provided ineffective assistance when he failed to subpoena or otherwise obtain Stone's cellular telephone records. Stone asserts that these records would have established that he was not at his house at the time when the inappropriate photographs of H.W. laying in his bed were taken. And, as a result, the records would have established that he had not taken the photographs. We note that in his motion for postconviction relief, Stone only alleged that the records may establish whether he was not at home when the photographs were taken. His allegation was equivocal. He did not affirmatively assert that he was not at home during these times. Upon our review, we find that Stone is not entitled to an evidentiary hearing on this issue.

We further note that even if Stone's cellular telephone records demonstrated that Stone's cellular telephone was not located at Stone's house when the photographs were taken, such evidence does not definitively demonstrate that Stone was not at his house when the photographs were taken. The records would also not explain how or why the photographs were later saved on Stone's other electronic devices. Ultimately, we conclude that given the totality of the evidence presented at trial, the admission into evidence of Stone's cellular telephone records would not have changed the result of the trial. The records would not have definitively contradicted H.W.'s allegations of sexual assault and would not have adequately rebutted the array of inappropriate photographs of H.W. found in Stone's possession. Stone cannot show that he was prejudiced by counsel's failure to obtain and offer into evidence the cellular telephone records.

*(ii) Electronic Devices in H.W.'s Home*

One of the photographs of H.W. in Stone's bed was taken with a specific electronic device that was not located in Stone's possession. Stone alleges that his trial counsel provided ineffective assistance in failing to investigate whether that specific electronic device was in the possession of H.W. and her family. He contends that if the device was found in the possession of H.W. or her family, such information would establish that someone else was responsible for taking one of the photographs of H.W. in Stone's bed. Upon our review, we find that Stone was not entitled to an evidentiary hearing on this issue.

As we discussed above, the evidence presented at trial suggested that one of the photographs of H.W. taken in Stone's bed was taken with Stone's cellular telephone. In addition, the evidence also established that both of the photographs of H.W. in Stone's bed were uploaded to Stone's laptop computer. Stone's assertion that the electronic device which took the other photograph of H.W. in his bed belonged to H.W.'s family is mere conjecture. He points to no evidence which would suggest that the device would have been found at H.W.'s residence had counsel attempted to locate the device. Moreover, even if the device was located at H.W.'s residence, that would not definitively demonstrate that Stone did not take the photograph of H.W.,

as Stone alleges. Locating the device at H.W.'s residence would also not explain how the photograph was downloaded and saved on Stone's laptop. Given all the evidence presented at trial, we do not believe that had counsel investigated the ownership of the electronic device, it would have changed the outcome of the proceedings.

*(iii) Presence of Ironing Board in Stone's Bedroom*

At trial, there was some discussion of whether one of the photographs taken of H.W. laying in Stone's bed was taken by another person present in Stone's bedroom or whether the photograph was taken using an automatic photo timer, such that H.W. could have taken the photograph herself. Photographs of Stone's bedroom, taken months after the sexual abuse concluded, showed that there were no shelves, tables, or desks present in the bedroom to assist with the positioning of the phone had the automatic photo timer had been used.

On appeal, Stone alleges that he informed his trial counsel that at the time the photograph of H.W. was taken, there was an ironing board located in his bedroom "which could have allowed for the taking of a self-imposed timer photo." Brief for appellant at 18. Stone alleges that his trial counsel was ineffective for failing to present this information to the jury. We find that Stone is not entitled to an evidentiary hearing on this issue. Stone testified in his own behalf at trial. He specifically denied taking the photographs of H.W. We cannot see how any further testimony that he may have given as to an alleged mechanism for how H.W. could have produced the photograph herself would have made his denial more believable. Trial counsel's decision not to have Stone elaborate on his theory of how the photograph could have been taken does not constitute deficient performance on the part of his trial counsel. Nor can Stone show that said decision was prejudicial to his defense.

(e) Failure to Depose State's Expert Witness

In his motion for postconviction relief and in this appeal, Stone alleges that his trial counsel was ineffective in failing to depose Sturgis prior to trial. Specifically, he alleges that had counsel deposed Sturgis, he would have discovered that she relied on two books as the bases for her opinions and would have discovered that the books "were at least six years old at the time of trial." Brief for appellant at 14. Stone alleges that such information would have called "the reliability of [Sturgis'] testimony into serious question." *Id.*

Upon our review of the record, we determine that despite counsel's failure to depose Sturgis prior to trial, he adequately cross-examined her regarding the accuracy and limitations of the studies that she relied on in forming her opinions. Counsel also questioned Sturgis regarding the application of the studies to specific victims of abuse. Given this cross-examination, it is not clear what additional information counsel could have obtained by deposing Sturgis. As the district court noted, "a failure to depose does not mean that the lawyer was unaware of the statements of the witnesses." We conclude that Stone cannot show he was prejudiced by counsel's failure to depose Sturgis.

## 2. TRIAL

### (a) Failure to Request Record to Include Voir Dire

At trial, voir dire proceedings were not recorded and, as a result, those proceedings are not included in our record. On appeal, Stone alleges that his trial counsel was ineffective by failing to request that voir dire be put on the record. Specifically, he asserts that because voir dire was not included in the record, he was not able "to have a meaningful appellate review of voir dire." Brief for appellant at 21.

In *State v. Jones*, 246 Neb. 673, 675, 522 N.W.2d 414, 415 (1994), the Supreme Court held that its court rules require the transcription of voir dire only "when requested by counsel, any party, or the court." See, also, Neb. Ct. R. § 2-105(A)(2) (rev. 2010). The court then reasoned that because recording voir dire is not mandatory by the court rules, "the failure to require recordation cannot be said, ipso facto, to constitute negligence or inadequacy of counsel." *State v. Jones*, 246 Neb. at 675, 522 N.W.2d at 415-16.

Given that a verbatim record of voir dire is not mandatory and given Stone's generalized claim of ineffective assistance of counsel in this regard, we find that Stone has failed to prove his trial counsel's performance was deficient, and he has failed to prove any prejudice from the fact that voir dire was not recorded. Stone has simply not explained with any specificity what occurred during voir dire which would have warranted any kind of relief either during his direct appeal or during his postconviction proceedings.

We do note that in his appeal from the district court's denial of an evidentiary hearing, Stone briefly alleges that during voir dire, his trial counsel failed to question prospective jurors as to their media exposure involving the allegations in the present case. Even assuming that counsel did not question the prospective jurors on this topic, we do not find that Stone was entitled to an evidentiary hearing on this issue.

The law does not require that a juror be totally ignorant of the facts and issues involved in the case. *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011). A dismissal of a prospective juror is not required if the prospective juror formed an opinion based on newspaper statements, communications, comments or reports, or upon rumor or hearsay if the prospective juror states under oath that he can render an impartial verdict and the court is satisfied of such. *Id*. Here, Stone does not allege that any of the venirepersons who actually sat on the jury were incapable of rendering an impartial verdict. In fact, given that the jury ultimately acquitted Stone of one of the charged counts of first degree sexual assault of a child, it seems clear that the jury was not fundamentally biased against Stone.

### (b) Failure to Present Testimony of Material Witnesses

#### (i) H.W.'s Father

Stone alleges that his trial counsel was ineffective "by neglecting to call H.W.'s father, Jerry [], to testify at trial." Brief for appellant at 13. Stone indicates that had Jerry testified, he would have impeached the credibility of H.W.'s trial testimony by stating that when he picked up H.W. from Stone's residence, he never smelled alcohol on H.W.'s person, nor did he suspect that she had previously consumed alcohol. The district court found that counsel's decision not to call

Jerry at trial must be considered a strategic trial decision. The court also noted, "One can easily see why calling H.W.'s father as a witness . . . could be a catastrophic move for the defense."

Upon our review of Stone's allegation of ineffective assistance of trial counsel, we first note that it is not clear from Stone's allegation how he knows what Jerry would have testified to if called to the stand. Stone's assertion without any explanation of the basis of his knowledge appears to be simple conjecture about Jerry's testimony. If Stone and his counsel did not know exactly what Jerry would testify to, we agree with the district court that calling him to testify would not have been a sound legal strategy. A reasonable strategic decision to present particular evidence, or not to present particular evidence, will not, without more, sustain a finding of ineffective assistance of counsel. *State v. Newman*, 300 Neb. 770, 916 N.W.2d 393 (2018). Strategic decisions made by trial counsel will not be second-guessed so long as those decisions are reasonable.

Moreover, we conclude that Stone has failed to demonstrate how he was prejudiced by trial counsel's failure to call Jerry to testify. Even if Jerry had testified that he did not smell alcohol on H.W. or suspect that she had been drinking when he picked her up from Stone's house, his testimony would not have definitively disproved H.W.'s allegations of sexual assault, especially considering the other evidence which corroborated H.W.'s claims. Based upon H.W.'s testimony, it seems that H.W. often consumed alcohol in advance of her sexual encounters with Stone and sometimes hours before being picked up by Jerry or another family member. H.W.'s testimony indicated that she did not consume excessive amounts of alcohol, typically only one drink. As such, it is possible that H.W. could have testified truthfully about consuming alcohol with Stone and that Jerry would not have smelled the alcohol on H.W.'s person. Consequently, if Jerry had testified that he did not notice that H.W. had been drinking, such testimony would not necessarily have impeached H.W.'s credibility.

### (ii) Stone's Family Members, Friends, and Coworkers

Stone alleges that his trial counsel was ineffective by failing to call multiple character witnesses to testify on his behalf, including, his family members, friends, coworkers, and four former students. Stone specifically alleges that these witnesses would have testified that Stone "is a generally affectionate person who routinely hugs people and frequently tells them that he 'loves' them." Brief for appellant at 15. He believes that this testimony would have negated testimony at trial that H.W.'s mother observed a "suspicious amount of affection toward H.W." by Stone. *Id*.

Upon our review, we agree with the district court that Stone is not entitled to an evidentiary hearing on this claim. Stone cannot demonstrate that he was prejudiced by counsel's failure to call these unnamed witnesses. Testimony which established that Stone was generally an affectionate person would not have any bearing on the specific allegations of sexual assault made by H.W. She alleged that Stone pursued a relationship with her when she was only 14 years old and then had sexual intercourse with her on multiple occasions over a 4-month period after she turned 15 years old. These allegations go far beyond Stone hugging H.W. or telling her he loves her.

### (iii) Stone's Psychiatrist

Stone alleges that his trial counsel was ineffective in "neglect[ing] to call [his] psychiatrist who would have testified that [Stone] has a 'savior' complex in which [he] feels the need to want to save people from adverse situations." Brief for appellant at 15. Stone alleges that the testimony

- 13 -

from his psychiatrist "would have nullified the State's theory that [his] interest in H.W. stems from a sexual attraction rather than a 'savior' complex." *Id*. We do not agree with the implication of Stone's assertions that his psychiatrist's testimony would have definitively changed the outcome of the proceedings. Even if the jury believed that Stone had a "savior" complex, as he alleges, such a belief would not necessarily have an effect on the jury's decision about whether Stone sexually assaulted H.W. In fact, as the district court suggested in its order, testimony from Stone's psychiatrist about his mental health problems could have had a negative impact on the jury. Stone cannot demonstrate that he was prejudiced by counsel's failure to call his psychiatrist to testify at trial.

*(iv) Independent Clinical Psychologist*

Stone alleges that his trial counsel was ineffective in failing to identify and have testify another clinical psychologist to refute the testimony of the State's expert witness, Sturgis. Stone first asserts that trial counsel should have "attempt[ed] to hire another expert to assist him in understanding Dr. Sturgis' claims and statistical data she relied on, or potentially, provide testimony to refute the claims made by Dr. Sturgis." Brief for appellant at 14.

We first reject Stone's assertion that another expert would have assisted trial counsel in cross-examining Sturgis regarding the bases of her opinions. As we discussed more thoroughly above, counsel adequately cross-examined Sturgis. Stone does not allege how this cross-examination would have been more effective given the advice of some other expert.

In addition, in assessing postconviction claims that trial counsel was ineffective in failing to call a particular witness, the Supreme Court has upheld dismissal without an evidentiary hearing where the motion did not include specific allegations regarding the testimony which the witness would have given if called. For example, in *State v. Davlin*, 277 Neb. 972, 766 N.W.2d 370 (2009), the defendant claimed that trial counsel was ineffective in failing to adduce the testimony of certain witnesses. The Supreme Court affirmed dismissal of the postconviction claim without an evidentiary hearing, reasoning that there was nothing in the postconviction motion or record to indicate the nature of any exculpatory evidence which the witnesses would have given if called. Similarly, in *State v. Threet*, 231 Neb. 809, 438 N.W.2d 746 (1989), *disapproved on other grounds, State v. Harris*, 267 Neb. 771, 677 N.W.2d 147 (2004), the court held that a postconviction allegation that defense counsel was ineffective in failing to procure witnesses favorable to the defendant was properly dismissed without an evidentiary hearing where the motion did not specifically identify the witnesses or the nature of their testimony. Therein, the court stated that in the absence of specific allegations in this regard, "a trial court need not conduct a discovery hearing to determine if anywhere in this wide world there is some evidence favorable to defendant's position." *State v. Threet*, 231 Neb. at 813, 438 N.W.2d 749.

Stone's allegations are similarly lacking in specificity. He does not identify another expert who would have testified in opposition to Sturgis' opinions. Moreover, even if another expert had testified and refuted some of Sturgis' opinions, it does not follow that the jury would have disregarded Sturgis' opinions. The weight and credibility of an expert's testimony are a question for the trier of fact, and triers of fact are not required to take opinions of experts as binding upon them. *State v. Kuhl*, 276 Neb. 497, 755 N.W.2d 389 (2008).

Stone also alleges that trial counsel should have hired an expert who "could have provided general testimony about [reactive attachment disorder], its symptoms, and how it may or may not impact a person's ability to remember and tell the truth." Brief for appellant at 15.

At trial, the State called Beverly Patitz to testify. Patitz is a licensed mental health counselor with experience treating children with reactive attachment disorder. Patitz has been H.W.'s treating therapist since September 2015. As a part of her testimony, Patitz detailed not only the general symptoms of children who suffer from reactive attachment disorder, but also detailed some of H.W.'s specific symptoms. During trial counsel's cross-examination of Patitz, he asked her about H.W.'s propensity to lie as a result of her reactive attachment disorder diagnosis and probed whether Patitz could believe H.W.'s claims about the sexual abuse, when she has lied about other things.

Stone's claims about trial counsel's failure to call another witness to testify regarding H.W.'s reactive attachment disorder diagnosis must fail both because he does not identify any expert who would have refuted Patitz' explanation of the disorder, nor does he allege how further testimony from another expert witness would have in any way changed the outcome of the proceedings.

### (c) Failure to Properly Cross-Examine State's Witnesses

#### (i) H.W.

Stone alleges that his trial counsel provided ineffective assistance when he failed to adequately cross-examine H.W. Specifically, Stone alleges that trial counsel should have cross-examined H.W. regarding her testimony that Stone had engaged in sexual conduct with her on 120 occasions; her testimony that Stone had taken a photograph of her while he was straddling her on his bed; her testimony that Stone first engaged in sexual penetration of her on her birthday in September 2014; and evidence that H.W. was known to lie when she felt pressured by her parents. Stone generally alleges that had his trial counsel cross-examined H.W. on these topics, H.W.'s credibility would have been "substantially undermined" and the jury would have had doubt regarding the reliability of H.W.'s account of the sexual assaults. Brief for appellant at 22. We will discuss each of these allegations in turn.

#### (ii) Number of Times H.W. Was Assaulted

During trial counsel's cross-examination of H.W. he asked her to provide her "best estimate" of the number of times she had penile/vaginal intercourse with Stone from August 2014 through February 2015. H.W. responded, "Roughly, by the math that I remember, that over roughly 120 times." In his motion for postconviction relief and in this appeal, Stone alleges that his trial counsel "was in possession of evidence which established that there were only approximately 20 days between September 24, 2014 and February 7, 2015 in which [Stone] and H.W. were both [in town] and [Stone's wife] was not [in town]." Brief for appellant at 22. Stone alleges that such evidence would have contradicted H.W.'s testimony regarding the number of sexual encounters between her and Stone. He further alleges that such evidence would have undermined H.W.'s credibility with the jury.

We find that Stone is not entitled to an evidentiary hearing on this allegation. First, Stone has failed to allege what "evidence" counsel was in possession of which would have established that there were only 20 days in which H.W. and Stone could have engaged in sexual contact undetected by Stone's wife. Moreover, trial counsel did question Stone about the number of days he and his wife were in town from September 2014 through February 2015. Stone's testimony established that, contrary to his postconviction assertion, he was in town for more than 20 days without his wife being present during the 5 months H.W. alleged the sexual abuse occurred. Stone testified that he was in Colorado for 1 week during October 2014, that he would visit his wife in Kansas every other weekend, and that he was gone the entire month of January 2015. Based on this testimony, it is reasonable to conclude that other than the dates specified, Stone was in town with H.W. outside the presence of his wife.

In addition, we note that trial counsel did otherwise question H.W.'s credibility. In fact, during H.W.'s testimony, she repeatedly admitted that she had previously lied about certain facts during her interviews with police and with professionals at the Child Advocacy Center. H.W.'s mother testified that H.W. had gotten in trouble at school for lying and H.W.'s therapist testified that H.W. has been known to lie and be manipulative. Given all of the other evidence presented to the jury regarding H.W.'s credibility, we do not find that trial counsel's failure to challenge H.W.'s somewhat inexact testimony that she had sexual intercourse with Stone on 120 occasions would have in any way changed the outcome of the trial. This is especially true considering that the jury was only asked to determine whether Stone had sexual intercourse with H.W. on five separate occasions, as charged in the amended information.

### (iii) Photograph Taken by Stone

At trial, H.W. testified that one of the photographs which depicted her naked under a sheet in Stone's bed was taken by Stone after they had had sexual intercourse and while Stone was straddling her. In his motion for postconviction relief and in this appeal, Stone alleges that his trial counsel provided ineffective assistance when he failed "to confront H.W. with the fact that H.W. previously claimed, during her July 5, 2015 [Child Advocacy Center] interview, that [Stone] only took one picture of her and this picture depicted H.W. wearing her bra and underwear." Brief for appellant at 22. Stone further alleges that had counsel questioned H.W. on this topic, "it would have cast serious doubt on whether [Stone] took [that particular] photo." Id.

Upon our review, we conclude that Stone is not entitled to an evidentiary hearing on this ground. Whether Stone actually took this photograph or exactly where he was positioned when he did so, was not an element of his charged offenses. As such, counsel's failure to challenge H.W.'s testimony on that specific fact would not have changed the ultimate outcome of the trial. This is especially true considering that trial counsel put H.W.'s credibility at issue during his cross-examination and during his examination of other witnesses. The jury still believed H.W.'s testimony that Stone sexually assaulted her on numerous occasions. Additionally, even if trial counsel had further questioned H.W.'s testimony about this particular photograph, evidence that the photograph was found on Stone's electronic devices along with evidence of other inappropriate photographs of H.W. in Stone's possession would remain unchanged and unexplained.

At trial, H.W. testified that the first time she and Stone had sexual intercourse was on her birthday, September 24, 2014. In his motion for postconviction relief and in this appeal, Stone alleges that his trial counsel was ineffective for failing to cross-examine H.W. regarding prior inconsistent statements she made about the first time she and Stone had sexual intercourse. The record refutes Stone's claim.

During trial counsel's cross-examination of H.W., he questioned her at length regarding false statements she made during interviews she gave prior to trial, including false statements about "when [H.W.] said the sexual encounters started and for how long they continued." The following colloquy occurred:

Q: You originally said that the activity that you were there to complain about started about October 1st and it went through February 28th?

A: Correct.

Q: And we'll get into the details of what you said. But you knew when you said that that that wasn't true, correct?

A: Yes.

Q: And you indicated -- or did you indicate at that time that the first incident of inappropriate contact between you and Mr. Stone was an event in October in which he kissed you?

A: Correct.

Q: And you told them at that time that the last event that could have happened was something that happened in connection with the conference on February 7th?

A: Yes.

Q: And you knew just for purposes of our discussion today that those dates and those events were incorrect?

A: Yes.

Q: And tell me if I have this right. If I don't, let me know. It's only after law enforcement came to you following their investigation and confronted you about problems with your timeline, problems with the dates, problems with other evidence not fitting with your claim that you changed your story, right?

A: Right.

Because trial counsel did cross-examine H.W. regarding prior inconsistent statements she made about when the sexual contact between her and Stone began, Stone is not entitled to an evidentiary hearing on this ground.

*(v) H.W.'s Tendency to Lie When Feeling
Pressure From Her Parents*

Stone alleges that his trial counsel was in possession of evidence that established H.W. had a tendency to lie when feeling pressure from her parents. He also alleges that his trial counsel was in possession of evidence that H.W. felt pressure from her mother to admit to an inappropriate

sexual relationship with Stone. Specifically, he alleges that H.W.'s mother repeatedly "press[ed]" H.W. about her relationship with Stone until H.W. eventually admitted that she and Stone had been involved in a sexual relationship. Brief for appellant at 23. We conclude that Stone is not entitled to an evidentiary hearing on this ground.

Stone's trial counsel cross-examined H.W. regarding her initial disclosure of the sexual assault to someone other than her mother. H.W. explained that she disclosed at that time because she "was struggling with things on my own and making really bad decisions about the things that have happened and taking my anger out on people, and it was finally to the point where I couldn't take it anymore." H.W. indicated that after this initial disclosure, she brought up the subject with her mother. Stone does not allege what evidence trial counsel possessed which would have refuted H.W.'s explanation regarding her initial disclosure or which would have demonstrated that the disclosure was the result of pressure from her mother. Moreover, as we discussed above, there was a great deal of information regarding H.W.'s tendency to lie and manipulate. Despite all of this evidence, the jury believed H.W.'s testimony regarding the sexual assaults. Stone offers nothing specific to suggest that the result of the proceeding would have been different had trial counsel offered any additional evidence regarding H.W.'s tendency to lie, especially to her parents.

### (vi) H.W.'s Mother

Stone alleges that his trial counsel provided ineffective assistance when he failed to adequately cross-examine H.W.'s mother, Lynne. Specifically, Stone alleges that trial counsel should have more thoroughly questioned Lynne regarding her statement that Stone rarely communicated with her about the schoolwork he was assisting H.W. with during his homeschool sessions. Stone argues that had trial counsel confronted Lynne with evidence that she and Stone did, in fact, communicate about homeschooling, that "it would have established that [Stone] had a genuine and sincere interest in assisting H.W. with her schooling as opposed to the State's theory that [Stone] was grooming H.W. and using the home-schooling in an attempt to sexually assault H.W." Brief for appellant at 25.

We agree with the district court that Stone was not entitled to an evidentiary hearing on this allegation. Stone cannot show that counsel's failure to question Lynne further about her specific communications with Stone regarding homeschooling H.W. had any bearing on the jury's decision to find Stone guilty of the charged offenses. Stone's interest and actions in assisting H.W. with her school work do not necessarily correlate with whether he sexually assaulted H.W. In fact, based upon the testimony of both Lynne and H.W., Stone was actively engaged in homeschooling H.W., and both Lynne and H.W. were initially appreciative of his efforts in this regard. However, H.W. testified that while Stone was homeschooling her, he was also sexually abusing her. Even if Stone's counsel went to greater lengths to point out that Stone was actively engaged in homeschooling H.W., there is nothing to indicate that such cross-examination would have changed the results of the proceedings.

Stone also alleges that his trial counsel should have questioned Lynne further regarding "her extremely positive perception" of him and "his efforts to assist in educating H.W." Brief for appellant at 25. Stone argues that had trial counsel elicited such testimony, it would have

demonstrated that Lynne encouraged his continued contact with H.W. and explained the amount of time he spent with H.W.

Again, we find that the district court did not err in denying Stone an evidentiary hearing on this ground because Stone's assertion is refuted by the record. Lynne testified at trial that when Stone initially offered to assist with H.W.'s homeschooling, she was very appreciative. In fact, text messages between Stone and Lynne which were received into evidence reflected Lynne's initial appreciation and positive feelings toward Stone. Lynne indicated during her testimony that after a while, she began to have concerns about Stone and H.W.'s relationship. Clearly, though, she continued to allow Stone and H.W. to be alone together through the first part of 2015, despite her concerns. An email from Lynne to Stone dated January 13, 2015, indicates that Lynne told Stone that she still believed Stone was a positive influence in H.W.'s life. Given all of the evidence which established that Lynne, initially, had a very positive perception of Stone, including Lynne's own admissions to such, trial counsel was not ineffective in failing to further question Lynne on this topic.

### (vii) Forensic Expert

During the State's direct examination of its forensic computer expert, it elicited testimony regarding the inappropriate photographs of H.W. which appear to have been taken while H.W. was in Stone's bed. Such testimony included an explanation of what the data showed about the date and time the pictures were taken, where the pictures were taken, and the device used to take the pictures.

On appeal, Stone alleges that his trial counsel provided ineffective assistance when he failed to properly cross-examine the State's forensic computer expert. Stone asserts that the State's expert "neglected to properly make a forensic copy of the hard drive of [his] laptop prior to hooking the laptop up to computer extraction software [and that a]s a result, the hard drive of [Stone's] lap top computer was corrupted[.]" Brief for appellant at 15. He further alleges that his counsel should have questioned the State's expert regarding whether the corruption of the laptop altered the date and time stamps of the photographs taken of H.W., which would have "cast serious doubt as to [Stone's] guilt." *Id*.

The record refutes Stone's claim of ineffective assistance of counsel. While trial counsel chose not to cross-examine the State's forensic computer expert, counsel did call another forensic computer expert to testify on Stone's behalf. The defense's expert testified that he worked closely with the State's expert and had access to all of the pertinent information regarding Stone's electronic devices. Trial counsel questioned the defense's expert at length about inconsistencies in the data and about what those inconsistencies may mean. Ultimately, however, the defense's expert agreed with the State's expert about the date, time, and location each photograph was taken: "[T]he dates don't lie."

The record reveals that trial counsel adequately addressed the testimony of the State's forensic computer expert by calling a separate expert to testify on Stone's behalf. Because the defense's expert agreed with the State's expert regarding the timing of the photographs, there would have been nothing to gain by counsel cross-examining the State's expert on this topic. Counsel did not provide ineffective assistance in this regard.

(d) Failure to Object to Certain Evidence

*(i) Sonogram Evidence*

During Stone's trial testimony, he testified that he told law enforcement that H.W. had sent him an email telling him that she was pregnant and that attached to this email was an image from a sonogram to prove the pregnancy. Stone also testified that he told law enforcement that he still had the sonogram image saved on his computer. The State's forensic computer expert located an image of a sonogram on two of Stone's electronic devices; however, the image indicated that it did not belong to H.W., but to another woman. A law enforcement officer testified that he subsequently identified and contacted the woman identified on the sonogram image. The officer testified he had a telephone conversation with this woman and learned that she is an acquaintance of Stone. During his testimony, Stone acknowledged that the sonogram image from his acquaintance was the only sonogram image located on his electronic devices and that one of his friends had sent him that image. He opined that H.W. had obtained a copy of the sonogram image when she had access to his electronic devices and then attached it to the email she sent to him.

On appeal, Stone alleges that his trial counsel provided ineffective assistance when he failed to object to the evidence of the sonogram image. Specifically, Stone alleges that counsel should have objected on the basis of hearsay and foundation to the law enforcement officer's testimony that he had a telephone conversation with the woman identified on the sonogram image and that he subsequently learned that the woman was acquainted with Stone. Stone argues, "By failing to object to this inadmissible evidence, the jury was allowed to conclude that the sonogram found on [Stone's] laptop computer came from an acquaintance of [Stone] rather than H.W." Brief for appellant at 28.

Stone is not entitled to an evidentiary hearing on this ground. Even if counsel should have made an objection to the hearsay testimony of the law enforcement officer regarding the sonogram evidence, Stone cannot demonstrate that he was prejudiced by counsel's failure. While Stone contends that the officer's testimony provided the jury with an inaccurate representation that the sonogram image originated from someone other than H.W., the record reveals that such a representation is, in fact, accurate. Stone, himself, testified that he originally received the sonogram image from a friend of his, not from H.W. Stone then guessed that H.W. had found the sonogram image on his electronic device and re-sent it to him along with her email. As such, it was Stone, and not the law enforcement officer, who told the jury exactly how Stone originally received the sonogram image. The officer's unobjected to testimony did not provide any additional facts regarding the discussion of the sonogram image which were prejudicial to Stone.

*(ii) Testimony of State's Rebuttal Witness*

At trial, the State called Dr. Stacie Bleicher, a pediatrician and medical director of the Child Advocacy Center in Lincoln, Nebraska, to testify. Bleicher examined H.W. after H.W. had disclosed that she had been sexually abused. The examination revealed that H.W. had a "normal-appearing" hymen. However, Bleicher explained that a "normal" examination of genitalia does not necessarily indicate that no sexual assault has occurred.

During the defense's case-in-chief, Stone called his own medical expert to testify. Dr. Angela Grone is an obstetrician and gynecologist employed by the Beatrice Community Hospital.

She opined that H.W.'s hymen would no longer be intact, or "normal," if in fact she had sexual intercourse with Stone on a regular basis, as H.W. had alleged. Grone did concede that she is not a sexual assault examiner and she has no specialized training in the area of sexual assault.

During the State's rebuttal, it called a third medical professional, forensic nurse examiner Annie Boatright. Boatright testified that she has seen at least 300 patients who required a sexual assault examination. She opined that a woman can have digital or penile penetration without injury to her hymen, especially if the penetration was consensual. Upon specific questioning by the State, Boatright indicated that a woman can have a "normal" hymen and have had intercourse more than 100 times. In addition, Boatright explained that the vaginal area heals very quickly, so if the hymen was injured during intercourse, that injury could heal within days to weeks. Boatright also testified about her understanding of a peer-reviewed article entitled, "Normal Doesn't Mean Nothing Happened." According to Boatright, this research article followed 36 females who had been sexually active and had become pregnant. Only 2 of the females who participated in the study were identified as having a visible injury in their vaginal area. The other 34 participants had normal vaginal areas.

On appeal, Stone alleges that his trial counsel provided ineffective assistance in failing to object to Boatright's testimony. Specifically, Stone alleges that counsel failed to make a foundational objection regarding Boatright's testimony about the peer-reviewed article; failed "to confront Ms. Boatright with the fact that her testimony misrepresented the findings described in the article;" and failed to confront Boatright with more recent scientific information, given that the article was published in 2004. Brief for appellant at 27.

We find that Stone was not entitled to an evidentiary hearing on this ground. Stone makes only conclusory allegations. He does not assert what foundation was lacking for Boatright's testimony. He also does not explain exactly how Boatright misrepresented the findings from the article. And, he does not explain what new research has been conducted since the article was written in 2004 or how that new research may have affected Boatright's opinion.

Moreover, we note that the peer-reviewed article was not brought up until the State's redirect of Boatright. The majority of Boatright's testimony was based upon her personal experiences as a forensic nurse examiner. Given the small role the peer-reviewed article played in Boatright's testimony, we cannot find it likely that the result of the proceedings would have been different had trial counsel objected to Boatright's discussion of the article or further cross-examined her on the article's contents. We affirm the decision of the district court to deny Stone an evidentiary hearing on this ground.

(e) Failure to Ensure Sufficient Time for Jury Trial

Trial in this case began on Monday, June 20, 2016. On Friday, June 24, 2016, the presentation of evidence was nearing a close. That morning, the judge had the following discussion with the jury:

Good morning, ladies and gentlemen. I understand you have come to an agreement that you would prefer to push through the rest of this evening and, if necessary, come back in the morning. You also told the bailiff that you don't want anyone to think that their case

should be rushed. You want to give the defendant sufficient time. And I am seeing nods of heads. So I appreciate that very much.

The evidence concluded on Friday evening. The jury and all of the parties returned on Saturday, and the case was submitted to the jury at 1 p.m. The jury returned its verdict at 7:01 p.m. that same day.

On appeal, Stone alleges first that he was denied his constitutional right to due process because he was not provided with sufficient time to present the "complicated" case to the jury. Brief for appellant at 29. However, as the State argues in its brief, Stone is precluded from raising this argument for the first time during these postconviction proceedings because he could have raised this argument on direct appeal. It is well established that a petition for postconviction relief may not be used to obtain review of issues that were or could have been reviewed on direct appeal. *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016).

Stone next alleges that he received ineffective assistance of counsel when counsel failed to request additional time to present the case to the jury. "The compressed format of [Stone]'s jury trial resulted in significant fatigue on the part of the trial judge, the attorneys, and the jury." Brief for appellant at 29. In the district court's order denying Stone's motion for postconviction relief, it stated:

> In regard to the claim that the Court, jury and witnesses appeared tired, the Court notes that this is not particularly unusual for a week-long trial; further, the jury was asked whether they wished to recess for the weekend and it chose to continue to work on a Saturday. This certainly does not rise to an inference that another trial would result in a different verdict.

We agree with the district court that Stone was not entitled to an evidentiary hearing on this claim of ineffective assistance. Stone has failed to provide sufficient evidence to demonstrate that he was in any way prejudiced by the length of the trial. He does not allege what other witnesses he would have called to testify or what other evidence he would have offered had there been additional time set aside for the trial. Moreover, the record reveals that not only did the jury choose to return to court on a Saturday in an effort to reach a verdict, but the jury also specifically informed the court and the parties that it did not want Stone to feel rushed in his presentation of the evidence. Stone has not explained how the result of the proceedings would have been different had the trial been allowed to extend into the following week.

### 3. ON DIRECT APPEAL

#### (a) Failure to Properly Preserve Constitutional Issue for Appellate Review

In Stone's direct appeal, his counsel argued that the mandatory minimum sentencing scheme of Neb. Rev. Stat. § 28-319.01 (Reissue 2016), violated the Equal Protection Clauses of the U.S. and Nebraska Constitutions by treating Stone more harshly than younger offenders. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017) Specifically, counsel argued that had Stone been 19-24 years old, rather than 58 years old, at the time of his crimes, he would have been convicted

of Class II felonies rather than Class IB felonies. *Id*. And, as a result, he would not have been subject to a 15-year mandatory minimum term of imprisonment. *Id.*

However, the Supreme Court determined that Stone's constitutional argument was not preserved for appellate review. *Id*. The court determined that the challenge to the sentencing scheme was a facial challenge, rather than an as applied challenge. *Id.* As such, Stone's counsel was required to have filed a motion to quash at the trial court level in order to preserve his constitutional challenge. *Id*. Because counsel did not file a motion to quash, the Supreme Court found that the constitutional argument had been waived. *Id.*

In his motion for postconviction relief and in this appeal, Stone claims his counsel provided ineffective assistance because he failed to properly preserve his constitutional argument for appellate review. Upon our review, we find that counsel did not provide deficient performance even though he failed to properly preserve Stone's constitutional claim for appellate review. Stone's claim that § 28-319.01 violated the Equal Protection Clause constitutes a novel constitutional challenge. In *State v. Sanders*, 289 Neb. 335, 855 N.W.2d 350 (2014), the Supreme Court concluded that a claim of ineffective assistance of counsel fails the first prong of the *Strickland* test where prior counsel is alleged to be deficient for failing to raise novel legal theories or constitutional challenges. The court stated: "It logically follows, and we now conclude, that counsel's failure to raise novel legal theories or arguments or to make novel constitutional challenges in order to bring a change in existing law does not constitute deficient performance." *State v. Sanders*, 289 Neb. at 343, 855 N.W.2d at 357. Therefore, trial counsel's performance on this issue cannot be considered deficient.

Even if counsel's performance could be considered deficient, Stone cannot demonstrate that he was prejudiced by trial counsel's performance. See *State v. McGhee*, 280 Neb. 558, 787 N.W.2d 700 (2010). In order to demonstrate prejudice, Stone must show that if counsel had properly preserved the constitutional claim for appellate review, that there is a reasonable probability that it would have changed the result of the appeal. See *State v. Timmens*, 282 Neb. 787, 805 N.W.2d 704 (2011).

In his motion for postconviction relief and in this appeal, Stone has failed to allege sufficient facts to demonstrate that he was prejudiced by counsel's failure to properly preserve the constitutional claim. Specifically, Stone has failed to provide any evidence or case law which would indicate his constitutional claim would have been successful had it been properly preserved. We note that Stone cited no case authorities in support of his equal protection claim in his brief submitted on direct appeal. Our research has also failed to reveal a case directly on point.

However, in a recent case, the Supreme Court did address a similar constitutional argument. In *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019), the appellant argued that § 28-319.01 is unconstitutional on its face because it warrants the imposition of a substantially harsher sentence than other first degree sexual assault statutes solely based on the ages of the victim and the offender. In *Hibler*, the court focused its analysis on the appellant's claims as they related to the victim's age, rather than as they related to the defendant's age. The court concluded that the age classifications to which the appellant was subject to in § 28-319.01(1)(a) are rationally related to plausible policy reasons considered by lawmakers and that the relationship of the classifications to their goals are not so attenuated as to render the distinction arbitrary or irrational.

The court explained, "As the legislative history showed, based on the policy, goals, and facts evinced therein, the Legislature required more severe punishments for first degree sexual assault of a young child, because it concluded it was a more serious crime." *Id*. at 343, 923 N.W.2d at 414.

Given the Supreme Court's decision in *State v. Hibler, supra*, finding that § 28-319.01 is constitutional even though it establishes different punishments based upon the age of the victim of the sexual assault, it seems likely that the Supreme Court would make a similar determination when analyzing the same claim based upon the age of the perpetrator of the sexual assault. Accordingly, Stone did not show he was prejudiced in any way by counsel's performance in this regard.

### (b) Failure to Challenge District Court's Decision to Sustain State's Motion to Quash H.W.'s School Records

In the days leading up to the trial, Stone's counsel subpoenaed certain records from Thayer County Public Schools regarding H.W. The State filed a motion to quash the subpoena, and the court determined that it would review the records "in-camera" in order to determine their relevance and admissibility. Both Stone and the State appear to agree that the court's ultimate resolution of the motion to quash is not clear from the record; however, it is clear from the record that the school records were never offered into evidence by Stone.

In this appeal, Stone alleges that his appellate counsel was ineffective for failing to allege on appeal that the district court erred in sustaining the State's motion to quash the school records. We find that Stone is not entitled to an evidentiary hearing on this ground. First, we note that, as the parties agree, the district court's ruling on the motion to quash is not clear from the record. As such, it is not clear what ruling appellate counsel would have challenged in Stone's direct appeal. Nonetheless, assuming that the district court did sustain the motion to quash, Stone has failed to allege any error in the district court's decision. Further, he does not assert that had appellate counsel raised this issue on direct appeal, counsel would have been successful.

## VI. CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in denying Stone an evidentiary hearing on allegations that his counsel was ineffective in matters related to pretrial motions and investigation, trial proceedings, and direct appeal. We affirm the district court's denial of postconviction relief without an evidentiary hearing.

AFFIRMED.